**Robert B. NEWMAN, Plaintiff–Appellant,**

v.

**George VOINOVICH, Defendant–Appellee.**

**No. 92–3345.**

United States Court of Appeals, Sixth Circuit.

Argued Sept. 29, 1992.

Decided Feb. 22, 1993.

Bruce I. Petrie, Sr. (argued and briefed), Michael E. Solimine (briefed), Cincinnati, OH, for plaintiff-appellant.

Patrick A. Devine, Kathleen McDonald O'Malley (argued and briefed), Office of the Atty. Gen., of Ohio, Columbus, OH, for defendant-appellee.

Before: KEITH, KENNEDY, and JONES, Circuit Judges.

KEITH, Circuit Judge.

Appellant Robert Newman, appeals the dismissal of his cause of action alleging that Governor George Voinovich's judicial appointment practices violates his rights under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 11 of the Ohio Constitution. The appellant also appeals the court's dismissal of his motion for injunc-

tive relief. For the reasons stated below, we AFFIRM.

## I.

Governor Voinovich, a Republican, makes interim judicial appointments pursuant to a procedure devised by his executive assistant. The procedure requires the assistance of Republican Party County Chairpersons to assist the Governor with the selection of judges and is coordinated by Andrew J. Futey, the Governor's Special Assistant for Boards, Commissions and Judges. Specifically, the Republican Chairpersons are asked to submit to the Governor the names and resumes of a minimum of two qualified individuals for consideration as temporary appointments for vacant judgeships within their respective counties. Of the qualified candidates to be submitted, at least one is to be a woman or a minority, if possible. The Chairpersons are also instructed to follow local party guidelines for recommending candidates for judicial appointments and to have the candidates screened by local bar associations. Only Republican County Chairpersons are asked to recommend candidates. Once the names of the candidates are forwarded to the Governor's Office, Futey has the sole responsibility of screening the candidates and making a recommendation to the Governor. Prior to making his recommendation, Futey requires the candidates to fill out background questionnaires, which are sent to the State Highway Patrol for background checks.

In late January 1992, it was announced that Norman Murdock was planning to resign from his post as Hamilton County Common Pleas Judge. After learning of Judge Murdock's planned resignation, James Robinson, Newman's law partner wrote a letter to the Governor requesting that Newman be considered as Judge Murdock's replacement. Futey concedes that he did no more than simply read Robinson's letter and Newman's resume. In fact, Fu-

tey testified that only under exceptional circumstances are candidates considered whose names are not submitted by Republican Chairpersons. Futey ultimately recommended Arthur Ney, Hamilton County Prosecuting Attorney, as Judge Murdock's replacement. Ney's name was submitted to the Governor by the Republican Party County Chairperson for Hamilton County. The Governor stipulated before trial that Ney would be his appointment for the Hamilton County Common Pleas Judge vacancy.

Appellant Newman is a practicing attorney and a registered Democrat in Hamilton County, Ohio. He challenged the Governor's judicial appointment practices as a violation of his rights to freedom of belief and association as guaranteed by the First and Fourteenth Amendment to the United States Constitution, and Article I, Section 11 of the Ohio Constitution. Newman also alleged that the Governor's judicial appointment practices violated his rights under the Voting Rights Act, 42 U.S.C. § 1973, and sought to enjoin the Governor from making appointments to fill any judicial vacancies within the state. In an opinion and order of March 31, 1992, the United States District Court for the Southern District of Ohio dismissed Newman's Voting Rights Act claim on the ground that Newman lacked standing to bring such a challenge because he is not a minority or an "aggrieved person" covered under the Act.[1] The court also dismissed Newman's freedom of association cause of action under the First and Fourteenth Amendments to the United States Constitution and Article I, Section 11 of the Ohio Constitution for failure to state a claim upon which relief could be granted. The district court also dismissed Newman's motion for injunctive relief, 789 F.Supp. 1410. This timely appeal followed. We discuss the district court's dismissal of Newman's freedom of association claim and his request for injunctive relief seriatim below.

---

1. Newman does not appeal this aspect of the district court's decision. Accordingly, our ruling in this case does not address the merits of whether the district court erred in dismissing

this aspect of Newman's claim or whether the Governor's judicial appointment practices violate the Voting Rights Act.

## II.

Newman contends that the Governor's judicial appointment process, as employed to fill the vacancy created by Judge Murdock's retirement, violates his rights of free speech and association under both the United States and Ohio Constitutions. In this appeal, Newman challenges the district court's dismissal of his constitutional challenges to the Governor's practice of appointing only Republicans to fill interim judicial vacancies.

■ We review the F.R.C.P. 12(b)(6) dismissal of appellant's constitutional claims *de novo. American Eagle Credit Corp. v. Gaskins,* 920 F.2d 352, 353 (6th Cir.1991). Specifically, this Court is to "take plaintiff's factual allegations as true and if it appears beyond doubt that the plaintiff can prove no set of facts in support of its claims that would entitle it to relief, then the dismissal was proper." *Id.*

Pursuant to Art. IV, Section 13 of the Ohio Constitution, Governor Voinovich routinely appoints judges recommended by Republican County Chairpersons to fill vacant judgeships. Article IV, Section 13 provides in pertinent part:

**Vacancy in office of judge, how filled.** In case the office of any judge shall become vacant, before the expiration of the regular term for which he was elected, the vacancy shall be filled by appointment by the governor, until a successor is elected and has qualified....

Ohio Const. art. IV, § 13. In *State ex rel., Hoyt v. Metcalfe,* 80 Ohio St. 244, 88 N.E. 738 (1909), the Ohio Supreme Court explained the judicial appointment provision of Article IV, Section 13, noting that "the office of judge is an elective office, an office that is to be filled by the people." *Id.* 88 N.E. at 742. The court also stated that the office of judge "is not an appointive office to be filled by any other authority save to the extent necessary to prevent a lapse." *Id.*

In support of his challenge to the Governor's judicial appointment practices, Newman relies on a trilogy of United States Supreme Court decisions: *Elrod v. Burns,* 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); *Branti v. Finkel,* 445 U.S. 507, 100 S.Ct. 1287, 63 L.Ed.2d 574 (1980); and *Rutan v. Republican Party of Illinois,* 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990). In *Elrod,* the Supreme Court addressed the question of whether public employees could be terminated or threatened with termination solely based on their political affiliation. The *Elrod* Court held:

Patronage ... to the extent that it compels or restrains belief and association, is inimical to the process which undergirds our system of government and is "at war with the deeper traditions of democracy embodied in the First Amendment."

*Elrod,* 427 U.S. at 357, 96 S.Ct. at 2682. Despite its general pronouncement against patronage dismissals, the Court went on to note that the "prohibition on encroachment of First Amendment protections is not absolute." *Id.* at 360, 96 S.Ct. at 2683. Specifically, the Court explained that "there is a need to insure that policies which the electorate has sanctioned are effectively implemented" and that this "interest can be fully satisfied by limiting patronage dismissals to policymaking positions." *Id.* at 372, 96 S.Ct. at 2689. The Court further observed that "[i]n determining whether an employee occupies a policymaking position, consideration should be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Id.* at 368, 96 S.Ct. at 2687.

In *Branti v. Finkel,* the Court elaborated on the "policymaking" exception to patronage dismissals articulated in *Elrod,* noting that:

the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

*Branti,* 445 U.S. at 518, 100 S.Ct. at 518. In *Rutan v. Republican Party of Illinois,* the Court held that "the rule of *Elrod* and *Branti* extends to promotion[s], transfer[s], recall[s], and hiring decisions based on party affiliation and support." *Rutan,*

497 U.S. at 78, 110 S.Ct. at 2739. This Circuit embraced the principle established in *Elrod* and its progeny in *Faughender v. Olmsted,* 927 F.2d 909 (6th Cir.1991).

■ With respect to Newman's claim that the Governor's judicial appointment practices violate his right to freedom of belief and association under the United States and Ohio Constitutions, the district court held that Newman did not state a claim upon which relief could be granted because *Elrod, Branti* and *Rutan* do not apply to gubernatorial appointments. We disagree with the district court's holding that gubernatorial appointments do not fall within the principle of *Elrod, Branti,* and *Rutan.* There is no meaningful distinction between "hiring decisions" for a public position as discussed in *Rutan* and making an "appointment" to a public position as presented here. An "appointment" is merely a type of "hiring decision." The overriding theme in *Elrod, Branti* and *Rutan* is that the First Amendment places significant limitations on the ability of government officials to make decisions affecting public employment based on considerations regarding an employee or prospective employee's political belief and association. Specifically, what *Elrod, Branti* and *Rutan* establish is that political patronage should play no role in government decision-making regarding non-policymaking public employment positions. We do not believe that by extending the principle of *Elrod* and *Branti* beyond terminations and threats of termination to promotions, transfers, recalls, and hiring decisions, the Court intended to exempt "appointments" to public office from this principle. Therefore,

the constitutionality of the Governor's judicial appointment practices must be assessed in light of this principle.[2]

■ In *Kurowski v. Krajewski,* the Seventh Circuit addressed the question of whether political beliefs may be the basis for the appointment of judges *pro tempore* under Indiana law. 848 F.2d 767 (7th Cir. 1988), *cert. denied,* 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988). The specific issue presented in *Kurowski* was whether a state judge with the authority to appoint assistant public defenders as judges *pro tempore,* was thereby vested with the authority to terminate assistant public defenders whose political beliefs differed from his. The court answered this question in the negative, stating that the dismissal of public defenders because of their political affiliation was a violation of their first and fourteenth amendment rights. The court noted that "public defender and judge *pro tempore* are not the same job" and that unlike judges *pro tempore,* public defender positions cannot be filled based upon political affiliation. *Kurowski,* 848 F.2d at 770–771. In distinguishing the policymaking role of a judge from the non-policymaking role of a public defender, the court wrote:

> A judge both makes and implements governmental policy. A judge may be suspicious of the police or sympathetic to them, stern or lenient in sentencing, and political debates rage about such questions. In most states judges are elected, implying that the office has a political component. Holders of the appointing authority may seek to ensure that judges

**2.** The Governor argues that the Supreme Court's reasoning in *Rodriguez v. Popular Democratic Party,* 457 U.S. 1, 102 S.Ct. 2194, 72 L.Ed.2d 628 (1982), is controlling here. In *Rodriguez,* the Supreme Court upheld a Puerto Rico statute which vested in a political party the authority to appoint interim replacements to fill vacancies in the legislature created by one of its own members. In rejecting the plaintiffs' constitutional challenges to the interim legislative appointment process, which included a freedom of association claim, the Court noted that "[n]o provision of the Federal Constitution expressly mandates the procedures that a state or the Commonwealth of Puerto Rico must follow in

filling vacancies in its own legislature." *Rodriguez,* 457 U.S. at 8, 102 S.Ct. at 2199.

While we recognize that there are close similarities between the issue presented in *Rodriguez* and the issue in the instant case, we do not believe *Rodriguez* provides the proper framework for analyzing the instant dispute. We think the Supreme Court's reasoning in *Elrod, Branti* and *Rutan* provides the appropriate framework for assessing the merits of the constitutional claims raised by Newman. Furthermore, members of the legislature are policymakers within the policymaker exception of *Elrod* and *Branti.*

agree with them on important jurisprudential questions.

*Kurowski*, 848 F.2d at 770.

The *Kurowski* court specifically rejected the argument that because judges must be non-partisan decisionmakers, political affiliation should not be considered in making judicial appointments. The court stated:

> If this is so then, for example, the governor could not consider a would-be judge's politics when deciding whom to appoint (because the judge is independent of the governor once in office), and the President could not consider the views of a prospective appointee to the Federal Trade Commission when making that selection. Neither *Elrod* nor *Branti* makes anything turn on the relation between the job in question and the implementation of the appointing officer's policies.

*Kurowski*, 848 F.2d at 770. We agree with the holding in *Kurowski* that judges are policymakers because their political beliefs influence and dictate their decisions on important jurisprudential matters. *See also Gregory v. Ashcroft*, —— U.S. ——, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) (holding that state judges are employees at the "policymaking level" under the Age Discrimination Employment Act). Therefore, we believe that Governor Voinovich's appointment of judges based on political considerations is consistent with *Elrod, Branti* and *Rutan*. In addressing the issue of appointments based on political considerations, the court stated:

> A governmental officer holding the power of appointment may make any decision he pleases, unless the Constitution bars the way. The pertinent provision—the guarantee of free speech contained in the first amendment—disables the government from firing a person based on his speech and political beliefs (and thus penalizing the employee for holding or advocating those beliefs) unless the beliefs are relevant to the job in question. They will be relevant, the Court said in *Branti* and *Elrod*, when the office involves making on the state's behalf the sort of decisions about which there are

political debates. That is to say, the first amendment does not remove political beliefs from politics; it would undermine the democratic process to hold that the winners at the polls may not employ those committed to implementing their political agenda.

*Kurowski*, 848 F.2d at 770. Accordingly, we hold that gubernatorial appointments to public positions are governed by the principle of *Elrod, Branti* and *Rutan*. With respect to gubernatorial appointments to the state judiciary, we hold that judges are policymakers within the meaning of *Elrod* and *Branti*. Therefore, Governor Voinovich is free to make judicial appointments based on political considerations.

Despite our holding in this case, we are troubled by the Governor's practice of considering only members of his party in making appointments to fill interim judicial vacancies. While this practice may be constitutional, we believe it is unwise. Though we recognize that the office of state judge has a political and policymaking component, we fail to see the necessity of an exclusionary appointment practice which makes political party affiliation a prerequisite for judicial service.

## III.

Appellant contends that the district court's denial of his request for a preliminary injunction was improper because it left him with no prospects of ever being considered for a judicial appointment by a Republican governor. However, because Newman does not have a claim upon which any relief can be granted, we need not review the district court's denial of his claim for a preliminary injunction.

## IV.

For the foregoing reasons, we AFFIRM the decision of the Honorable George C. Smith, United States District Judge for the Southern District of Ohio.

KENNEDY, Circuit Judge, concurring.

I concur in all of Judge Keith's opinion except the last paragraph in Part II where

he writes that the Court believes that the practice of appointing judges only from the governor's party in making judicial appointments is unwise. Whether it is wise or unwise is not submitted to us for decision. The citizens of the State of Ohio have given the power to appoint interim judges to their elected governors. The wisdom of the governors' policies will be judged in the voting booths.[1]

NATHANIEL R. JONES, Circuit Judge, concurring.

While I generally agree with and am pleased to join Judge Keith's compelling opinion in this case, I write separately to note my interpretation of First Amendment law in this area and to express my concerns with the current practice of Ohio's Governor regarding interim judicial appointments.

Judge Keith's majority opinion makes a persuasive argument for expanding or illuminating the phrase "hiring decisions," as stated in *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 78, 110 S.Ct. 2729, 2739, 111 L.Ed.2d 52 (1990), by including gubernatorial appointments within the contours of that phrase. I think that it is correct to conclude that, in general, a gubernatorial appointment is merely a type of hiring decision.

After determining that gubernatorial appointments fall within the meaning of "hiring decisions," the issue then becomes whether a governor's interim judicial appointments may be made based on party affiliation. As Judge Keith's opinion notes, the present analysis used in this area of First Amendment jurisprudence requires the courts to determine whether a position of public employment is a "policymaker" position. In addition, the opinion allows that the ultimate inquiry is whether the Governor can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved.

Judicial appointments present an interesting twist on that analysis. For example, while a judge may be a "policymaker" in a broad sense, a judge is not a "policymaker" for the appointing governor. Rather, the judiciary is an independent arm of the government, unconnected by oath or duty to the governor's office or political party. Once appointed, a judge does not and should not answer to a governor's directives or opinions. Therefore, the link between an appointee judge and the appointing governor is fundamentally different from the link between a governor and other gubernatorial appointees who are appointed to fulfill the political or policy objectives of a governor. Although it discussed the constitutionality of having judges on a non-partisan ballot, the Ohio Supreme Court, in *State ex rel. Weinberger v. Miller*, 87 Ohio St. 12, 99 N.E. 1078, 1085 (1912), provided eloquent language highlighting the difference between the judiciary and other branches of government:

Legislative and executive officers are selected for the avowed purpose of promulgating definite principles and methods of government advanced by [their] respective parties.... No partisan political platform can be written for the judge. He is charged with the interpretation and the administration of the law as he finds it. He has no voice in framing it. He must not depart from the plain provisions thereof, no matter how much he may be opposed to the principles or purposes of it. In the discharge of his duty, a judge is not concerned with party platforms or party expediency. *In his official capacity he can serve no party, promulgate no partisan theories of government, encourage no partisan economic measures.*

(Emphasis added.)

Similarly, it cannot be seriously contended that being a member of a certain party,

---

1. The practice of appointing judges of the same party as the appointing officer is undisputed and is used by both major parties. The record discloses that the previous Ohio governor, a Democrat, appointed only members of the Democratic party. The present governor, a Republican, has appointed only two Democrats. On the federal level, presidents have appointed almost exclusively members of their own party and have campaigned on the issue of judicial appointments.

in this case the Republican Party, should be a requirement for the *effective performance* of being a judge. *See Rutan,* 497 U.S. at 91, 110 S.Ct. at 2746 (Scalia, J., dissenting) ("if there is any category of jobs for whose performance party affiliation is not an appropriate requirement, it is the job of being a judge, where partisanship is not only unneeded but positively undesirable").

Notwithstanding the above, persons elevated to the bench do not leave their ideals, life experiences, and political philosophies behind. Consider the reflections of the late Justice Benjamin Cardozo:

> There has been a certain lack of candor in much of the discussion ... or perhaps in the refusal to discuss it, as if judges must lose respect and confidence by the reminder that they are subject to human limitations. I do not doubt the grandeur of the conception which lifts them into the realm of pure reason, above and beyond the sweep of perturbing and deflecting forces. None the less, if there is anything of reality in my analysis of the judicial process, they do not stand aloof on these chill and distant heights; and we shall not help the cause of truth by acting and speaking as if they do. The great tides and currents which engulf the rest of man do not turn aside in their course and pass judges by.

Benjamin N. Cardozo, *The Nature of the Judicial Process,* 167–68 (1921). Almost every decision rendered by a judge has been influenced by various factors, including one's general philosophy on the implementation and interpretation of the law. *See Kurowski v. Krajewski,* 848 F.2d 767, 770–71 (7th Cir.), *cert. denied,* 488 U.S. 926, 109 S.Ct. 309, 102 L.Ed.2d 328 (1988). This is not to say that a judge may set one's own agenda or create one's own policies; however, it would ignore reality to suggest that a judge is not influenced by an infinite number of factors. "If you ask how [the judge] is to know when one interest outweighs another, I can only answer that he must get his knowledge just as the legislator gets it, from experience and study and reflection; in brief, from life itself." *Id.* at 113. Moreover, as a direct result of those factors, a judge does create a particular brand of governmental policy.

Any person charged with the appointment of a member of the judiciary should be aware of those factors which may suggest how a person may treat an issue. That person should not be prevented from choosing a prospective judge based on that prospective judge's general views on the implementation and interpretation of the law. In Ohio, it is the governor who is charged by the Ohio Constitution with appointing interim judges, *see* Ohio Const. art. IV, § 13. Therefore, a governor should be free to choose persons who share (or do not share) his/her general philosophy on the implementation and interpretation of the law.

In determining a prospective judge's general philosophy, a governor should be able to look at various aspects of that person's life. Undoubtedly, there are an infinite number of ways to determine a judge's general philosophy. Party affiliation may provide some insight to the types of philosophies a prospective judge maintains. As a result, I absolutely agree with Judge Keith that political affiliation may be *an appropriate factor* to consider when making interim judicial appointments.

In addition, because I find that judges are unique types of "policymakers" and that party affiliation may be *an appropriate factor* to consider when making a judicial appointment, I find that the general philosophy underlying *Rutan* does allow a governor to make judicial appointments with party affiliation in mind.

Nonetheless, I am gravely troubled by the Ohio Governor's practice of considering or appearing to only consider members of his own party in filling these vacancies. Using political affiliation as a *factor* in filling appointments is drastically different from using political affiliation as *an exclusive means* of appointing judges. The latter appears to be this case by virtue of the requirement of aspirants to solicit the favor of a political organization. The operative system of routing prospective judicial appointees through a political organization

is reminiscent of Tammany Hall (the headquarters of the Tammany Society of New York, a political organization which sought municipal political control by methods associated with corruption and .bossism), from which candidates for political office were required to obtain validation. While I am not implying that the Governor's use of Republican county chairpersons be equated with the big bosses of Tammany Hall, the process of using political affiliation as *the exclusive means* of appointing judges certainly has the tendency to reinforce that perception. Although the present state of First Amendment jurisprudence may deem such a practice constitutional, the Governor's present practice makes me wonder whether the federal judiciary ought to reassess the propriety of the First Amendment analysis as stated in *Rutan* as it relates to this type of case.