NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 14a0469n.06

Case No. 14-5324

**FILED**

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**JUN 3 0 2014**

**DEBORAH S. HUNT, Clerk**

| | | |
|---|---|---|
| HERBERT SANFORD MONCIER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | ON APPEAL FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| BILL HASLAM, Governor of the State of | ) | DISTRICT OF TENNESSEE |
| Tennessee; MARK GOINS, Tennessee | ) | |
| Coordinator of Elections, | ) | |
| | ) | |
| Defendants-Appellees. | ) | OPINION |

BEFORE:    MERRITT, COLE, and WHITE, Circuit Judges.

COLE, Circuit Judge.   In 1994, the Tennessee General Assembly enacted a plan for the selection, evaluation, and retention of judges who serve on the Supreme Court of Tennessee and the state's appellate courts ("the Tennessee Plan").  Under the Tennessee Plan, the Governor may temporarily fill judicial vacancies by appointment, but those gubernatorial appointees must then run in a retention election to fulfill the remainder of the unexpired term they are serving.  Herbert Moncier, proceeding pro se, brought suit under Section 1983, challenging the Tennessee Plan on the grounds that it violates his (and the people of Tennessee's) First and Fourteenth Amendment rights to ballot access and political association.  The district court dismissed Moncier's suit due to lack of standing after determining that he alleged, at most, a generalized grievance involving an abstract question of wide public significance.  For similar reasons, we affirm.

## I. BACKGROUND

This appeal involves a challenge to the constitutionality of Tennessee Code §§ 17-4-101 through 17-4-116, known commonly as the Tennessee Plan, which governs the way in which judges of the Tennessee appellate courts are initially selected and thereafter stand for election. By now, the Tennessee Plan is no stranger to legal challenge, both at the federal and state level. *See, e.g., Johnson v. Bredesen*, 356 F. App'x 781 (6th Cir. 2009) (affirming district court's dismissal of a federal constitutional challenge to the Tennessee Plan as it related to the election of state supreme court justices); *Hooker v. Haslam*, No. M2012-01299-SC-R11-CV, 2014 WL 1010367 (Tenn. Mar. 17, 2014) (holding that the Tennessee Plan, as it relates to state appellate-court judges, does not violate the state constitution).

The Tennessee Plan provides that if a vacancy occurs in the office of an appellate-court judge by death, resignation, or otherwise, the Governor shall fill the vacancy by appointing one of the three persons nominated by the Judicial Nominating Commission ("JNC").[1] Tenn. Code § 17-4-112(a)(1). Likewise, if an incumbent appellate-court judge determines not to seek retention for another term, the Tennessee Plan provides that a vacancy occurs in that office upon the expiration of the incumbent's term, effective September 1. *Id.* § 17-4-116(a). In such event, the Governor may fill the vacancy under the procedures outlined in §§ 17-4-112 or 17-4-113, but the Governor's appointee must then stand for a retention election at the next August general election to fill the remainder of the unexpired term. *Id.* § 17-4-116(a).

---

[1] Though not relevant to this appeal, the Tennessee General Assembly amended the Tennessee Plan to terminate operation of the JNC. *See* Tenn. Code § 4-29-233(a)(15). Following this change in the law, the JNC wound up its business and then ceased to exist as of July 1, 2013. *See id.* § 4-29-112. Nevertheless, the appointments at issue in this appeal were all filled with the assistance of the JNC prior to winding up its affairs, and the Tennessee Plan remains substantively unchanged in all other respects.

On May 24, 2013, Judge Joseph Tipton of the Tennessee Court of Criminal Appeals notified Governor Bill Haslam that he would not seek retention for another term in the August 2014 election. The JNC then issued notice that it was accepting applications to fill the vacancy Judge Tipton's decision would create and subsequently held a public hearing to interview interested candidates and to allow public comment on the qualifications of the applicants. The JNC ultimately submitted several names to the Governor, and from those names, the Governor selected Robert H. Montgomery to fill the vacancy. Thus, under the Tennessee Plan, Montgomery will fill the vacancy created upon the expiration of Judge Tipton's term, effective September 1, 2014, but Montgomery must run in an August 2016 retention election (involving a simple yes-or-no vote) to be eligible to serve the remainder of that term. *See id.* § 17-2-116(a).

Herbert Moncier, the plaintiff in this suit, wishes to fill Judge Tipton's position on the Tennessee Court of Criminal Appeals. He did not, however, submit an application to the JNC to be considered for the seat, nor did he appear at the public meeting or otherwise comment on the qualifications of the actual applicants. Moncier instead requested that Mark Goins, the State Coordinator of Elections, place his name on the August 2014 ballot as a candidate for the office. Coordinator Goins denied Moncier's request and directed him to the "Tennessee statutes that provide for the manner judges are appointed and stand for election in Tennessee."

Moncier filed this suit in federal district court against Governor Haslam and Coordinator Goins, seeking a declaration that the Tennessee Plan is unconstitutional. Moncier alleged that, in implementing the Tennessee Plan to fill Judge Tipton's seat, the defendants are violating his First and Fourteenth Amendment rights under the United States Constitution by denying him access to the August 2014 ballot and the right to political association.

The defendants answered Moncier's complaint and requested that the district court dismiss the suit, citing a lack of subject-matter jurisdiction because Moncier purportedly lacked standing. On December 6, 2013, Moncier filed an application for a temporary injunction directing Coordinator Goins to provide him with a nomination petition for the office of judge of the Tennessee Court of Criminal Appeals and to provide him with instructions on how many nominating signatures are required, from which counties those signatures are required, and the deadline for filing a nominating petition. Moncier also filed several motions to amend his complaint and his motion for temporary injunctive relief. The district court did not rule on these individual motions prior to dismissing the suit.

On February 28, 2014, the district court issued a memorandum opinion dismissing Moncier's complaint and denying his motion for a temporary injunction. *Moncier v. Haslam*, No. 3:13–CV–630–TAV–HBG, 2014 WL 806418, at *8 (M.D. Tenn. Feb. 28, 2014). The court determined that Moncier had failed to establish the constitutional minimums for standing based on his First and Fourteenth Amendment claims. *Id.* at *3–7. "At bottom," the court reasoned, "[Moncier's] complaint is a generalized grievance that involves abstract questions of wide public significance," and not a request for relief from a concrete and particularized injury, as required for Article III standing. *Id.* at *5 (citation and internal quotation marks omitted). Accordingly, the district court dismissed Moncier's complaint and denied his motion for a temporary injunction due to lack of subject-matter jurisdiction. *Id.* at *7. Whether for mootness or futility, the district court also denied Moncier's various motions to amend, strike, and supplement his complaint and motion for temporary injunctive relief. *Id.* at *8. The court then directed the clerk to close Moncier's case in its entirety. *Id.*

Moncier timely filed a notice of appeal challenging the dismissal of his complaint and an amended notice of appeal challenging the denial of his motion for a temporary injunction. Moncier did not, however, appeal the denial of his motions to amend his other filings. Accordingly, we need not address the claims he presented in those tendered amendments. *See* Fed. R. App. P. 3(c)(1)(B) (requiring notices of appeal to "designate the judgment, order, or part thereof being appealed"); *Torres v. Oakland Scavenger Co.*, 487 U.S. 312, 315 (1998) (holding that compliance with Rule 3 is both a "mandatory and jurisdictional" prerequisite to appeal (internal quotation marks omitted)).

## II. ANALYSIS

We review de novo the dismissal of a case for lack of standing. *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 348 (6th Cir. 2007). As the party seeking relief in federal court, Moncier bears the burden of establishing that he has standing. *See Summer v. Earth Island Inst.*, 555 U.S. 488, 493 (2009).

### A. Requirements for Standing

Article III of the United States Constitution restricts the federal judicial power to the resolution of "Cases" and "Controversies." U.S. Const., art. III, § 2. This case-or-controversy requirement is satisfied only where a plaintiff has standing to bring suit. *Sprint Commc'ns Co. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). To assert Article III standing, a plaintiff must establish the following: "(1) an injury in fact (*i.e.*, a concrete and particularized invasion of a legally protected interest); (2) causation (*i.e.*, a fairly traceable connection between the alleged injury in fact and the alleged conduct of the defendant); and (3) redressability (*i.e.*, it is likely and not merely speculative that the plaintiff's injury will be remedied by the relief the plaintiff seeks in bringing suit)." *Id.* (brackets, ellipsis, citation, and internal quotation marks omitted). The

Supreme Court has described these criteria as the "irreducible constitutional minimum" for bringing suit in federal court. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

In addition to the Article III standing requirements described above, federal courts have long imposed prudential limitations on the exercise of their jurisdiction. *See, e.g., Allen v. Wright*, 468 U.S. 737, 751 (1984); *Barrows v. Jackson*, 346 U.S. 249, 255–56 (1953). *But see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386–88 (2014) (abrogating a line of prudential-standing cases not relevant to this appeal). Under these prudential limitations, courts should refrain from exercising jurisdiction "when the asserted harm is a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citations omitted); *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 793 (6th Cir. 2009). Moreover, "plaintiff[s] generally must assert [their] own legal rights and interests," without resting their claims on the rights or interests of third parties. *Warth*, 422 U.S. at 499; *Wuliger*, 567 F.3d at 793.

Our standing inquiry focuses primarily on the party bringing suit, and not the merits of the action. *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 484 (1982). Nevertheless, this inquiry often depends on the nature and source of the claims and requires a "careful judicial examination of the complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claims asserted." *Allen*, 468 U.S. at 752 (asking, among other questions, whether the claimed injury is "too abstract, or otherwise not appropriate to be judicially cognizable"; whether "the line of causation between the illegal conduct and injury is too attenuated"; and whether "the prospect of obtaining relief from the injury as a result of a favorable ruling [is] too speculative"), *abrogated on other grounds by Lexmark*, 134 S. Ct. at 1386.

## B. Moncier Lacked Standing to Challenge the Tennessee Plan

After careful consideration of Moncier's constitutional challenge to the Tennessee Plan, the district court determined that he lacked standing because the injuries of which he complained were not "concrete and particularized," but rather "generalized" and "abstract," involving "questions of wide public significance" to all Tennesseans. *Moncier*, 2014 WL 806418, at *5–6. We agree.

We do not write on a blank slate in determining whether Moncier has standing. His suit represents the latest in a long line of cases seeking to upend the Tennessee Plan for one reason or another. *See Hooker*, 2014 WL 1010367, at *2 n.3 (collecting unsuccessful cases challenging the Tennessee Plan on state and federal constitutional grounds, filed in both state and federal court). Five years ago, we addressed a nearly identical challenge to the Tennessee Plan as it relates to the election of justices of the state supreme court. *Johnson*, 356 F. App'x at 781–82. There, we held that plaintiffs who were similarly situated to Moncier lacked standing to bring claims under the Fourteenth Amendment to the United States Constitution. *Id.* at 783–84. Relying on Supreme Court precedent, we determined that the plaintiffs could not "challenge laws of general application where their own injury is not distinct from that suffered in general by other taxpayers or citizens." *Id.* at 784 (quoting *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 598 (2007)). We explained that "the judicial power of the United States defined by Art[icle] III is not an unconditional authority to determine the constitutionality of legislative or executive acts." *Id.* (brackets, citation, and internal quotation marks omitted). Because the plaintiffs merely alleged that, in carrying out the Tennessee Plan, state officials were not complying with the Fourteenth Amendment, the plaintiffs "failed to assert a particularized stake in the litigation" and therefore lacked standing. *Id.* (internal quotation marks omitted).

Moncier's challenge to the Tennessee Plan suffers from many of the same shortcomings. Rather than asserting a "particularized stake in the litigation," Moncier's complaint contained mostly general allegations that the manner in which Tennessee selects and retains its appellate-court judges violates his rights *and the rights of all Tennessee voters* under the First and Fourteenth Amendments. His complaint repeatedly maintained that "the people of Tennessee" have been or will be deprived of their right to vote for the office of Judge of the Tennessee Court of Criminal Appeals in the August 2014 general election and that he seeks relief on their behalf. *Moncier*, 2014 WL 806418, at *5. Moreover, as the district court determined, at a hearing on Moncier's various motions to amend his filings, "[Moncier] claimed he was injured because he wanted to run for office, [and] *he emphasized that he was pursuing this litigation on behalf of the people of Tennessee to make a point about the manner in which appellate court judges are selected and retained.*" *Id.* (emphasis added).

This is precisely the type of generalized grievance courts have found ill-suited for judicial resolution. *See, e.g., Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 220–21 (1974) ("[S]tanding to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share."). In *Lance v. Coffman*, 549 U.S. 437 (2007) (per curiam), the Supreme Court affirmed the dismissal of a challenge to Colorado's 2003 redistricting plan brought by four private citizens because "[t]he only injury plaintiffs allege is that the law—specifically the Elections Clause [U.S. Const. art. I, § 4, cl. 1]—has not been followed." *Id.* at 442. The Court went on to state that the asserted injury "is precisely the kind of undifferentiated, generalized grievance about the conduct of government that we have refused to countenance in the past." *Id.* (distinguishing the *Lance* plaintiffs from other voting-rights plaintiffs and cases where the Court found standing).

Moncier makes no effort to distinguish his claims under the First and Fourteenth Amendments (which rely heavily on *Anderson v. Celebreeze*, 460 U.S. 780 (1983), and *Burdick v. Takushi*, 504 U.S. 428 (1992)) from *Hein, Schelesinger, Lance*, or any number of other Supreme Court cases that denied standing where a plaintiff asserted "a general interest common to all members of the public" in the conduct of their government. *Lance*, 549 U.S. at 440 (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937) (per curiam)). The crux of Moncier's complaint is that Tennessee voters cannot, in all instances, elect the judges of the state's appellate courts. This injury is "plainly undifferentiated and common to all members of the public." *Id.* at 440–41 (internal quotation marks omitted); *Johnson*, 356 F. App'x at 784.

Moncier presents a closer call on the issue of standing to the extent that he alleges he was denied the opportunity to appear on the August 2014 ballot. Here, his purported injury differs slightly from the plaintiffs who challenged the Tennessee Plan in *Johnson v. Bredesen*. One of the *Johnson* plaintiffs, John Jay Hooker, initially argued that the Tennessee Plan violated his constitutional rights because it denied him an opportunity to be a candidate for the Supreme Court of Tennessee. 356 F. App'x at 782. The district court nevertheless found that Hooker lacked standing because he made "no contention of unequal treatment as a potential candidate pursuant to the equal protection clause" and because our court already held that Hooker "ha[d] no property right to run for a state office." *Johnson v. Bredesen*, Nos. 3:07-0372, 3:07-0373, 2008 WL 701584, at *5 (M.D. Tenn. Mar. 13, 2008) (citing *Hooker v. Anderson*, 12 F. App'x 323, 324 (6th Cir. 2001) (affirming the district court's dismissal of Hooker's suit and noting that he had no property right to be a candidate)). Nevertheless, Hooker did not appeal that portion of the district court order, so we had no cause to determine whether he had standing to challenge the Tennessee Plan based on his own desire to run for office. *Johnson*, 356 F. App'x at 782.

Here, the district court "recognized [Moncier's] injury in that he was denied the opportunity to be placed on the August 2014 ballot" but found that, "on the basis of his allegations and arguments," Moncier had yet again presented "a generalized grievance shared by a large class of citizens." *Moncier*, 2014 WL 806418, at *5 ("Undoubtedly, any Tennessean who desires to run for the office of an appellate judge would encounter the exact same obstacles that plaintiff has asserted here."). There is some purchase to the district court's rationale, though Moncier points out that his harm is somewhat unique in that (1) only a licensed attorney can qualify for one of the state's appellate judgeships; (2) only a resident from the Eastern Grand Division can qualify for the particular judgeship Moncier seeks; and (3) unlike other qualified voters, Moncier took *some* steps to seek this judgeship (though he failed to apply to the JNC).

Ultimately, we need not weigh-in on this portion of the district court's opinion because there is no federally protected interest in seeking a state-court judgeship that, under state law (as interpreted by the state supreme court), already has been lawfully filled by gubernatorial appointment. *See Snowden v. Hughes*, 321 U.S. 1, 7 (1944) ("The right to become a candidate for state office . . . is a right or privilege of state citizenship . . . ."); *Newman v. Voinovich*, 986 F.2d 159, 161, 163 (6th Cir. 1993) (affirming dismissal under Rule 12(b)(6) of a suit challenging Ohio's judicial-appointment procedures under the First and Fourteenth Amendments); *Burks v. Perk*, 470 F.2d 163, 165 (6th Cir. 1972) ("Public office is not property within the meaning of the Fourteenth Amendment."); *see also Wilson v. Birnberg*, 667 F.3d 591, 598 (5th Cir. 2012) ("[T]here is no constitutional right to run for state office protected by the Fourteenth Amendment." (citation and internal quotation marks omitted)); *Velz v. Levy*, 401 F.3d 75, 86–87 (2d Cir. 2005) ("[Plaintiff] lacks a constitutionally cognizable property interest in her employment as an elected official.").

Because Moncier has no federally protected interest in appearing on the ballot as a candidate for state-court judge, dismissal would have been equally appropriate under Federal Rule of Civil Procedure 12(b)(6). *Newman*, 986 F.2d at 163. We note that the defendants twice requested dismissal on this ground below.

Moncier cites *Anderson v. Celebrezze* and *Burdick v. Takushi*, but those cases offer no refuge. *Anderson* and *Burdick* established "the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters … to cast their votes effectively." *See Miyazawa v. City of Cincinnati*, 45 F.3d 126, 127 (6th Cir. 1995) (quoting *Anderson*, 460 U.S. at 787)). Together, they created a balancing test, commonly referred to as "the *Anderson-Burdick* standard," for courts to apply when reviewing constitutional challenges to state election laws. *See Obama for Am. v. Husted*, 697 F.3d 423, 428–30 (6th Cir. 2012).

But both *Anderson* and *Burdick* presupposed that state law required an election for a particular office in the first place. *Anderson*, 460 U.S. at 782 (reviewing Ohio's process for presidential candidates to qualify for the general-election ballot); *Burdick*, 504 U.S. at 430 (reviewing Hawaii's write-in balloting system for electing members of the state legislature). Neither case mandated that states organize their governments in a particular manner or provide for the election of state-court judges. Nor did either case stipulate when states may deem a particular office vacant or specify how states must fill those vacancies. Accordingly, *Anderson* and *Burdick* bear little weight on Moncier's challenge to the Tennessee Plan, which provides that Judge Tipton's seat on the court of criminal appeals will remain occupied by gubernatorial appointment until 2016. Ultimately, Moncier's reliance on *Anderson* and *Burdick* falls short because he has no recognized right under the United States Constitution to run for an office that, under state law, already has been filled.

Moncier also asserts that the district court erred in dismissing his complaint because he pleaded an additional twenty causes of action, including several causes of action under the Tennessee Constitution and state statutory *quo warranto* procedures, all of which provided him with the requisite standing or claim for relief. Moncier pleaded these additional causes of action, however, in his proposed amended complaint, which the district court declined to allow him to file. *Moncier*, 2014 WL 806418, at *8. Moncier did not notice an appeal of that denial, nor has he alleged in his briefing with this court that the district court abused its discretion by denying his various motions to amend his pleadings. Consequently, the issue of whether Moncier has standing or a plausible claim for relief under the additional causes of action he asserted is not properly before this court. *See United States v. Johnson*, 440 F.3d 832, 845–46 (6th Cir. 2006) ("An appellant abandons all issues not raised and argued in its initial brief on appeal." (brackets and internal quotation marks omitted)). Because Moncier asserted no cognizable legal right under the United States Constitution, his state claims are best left to the state courts.

## III. CONCLUSION

We affirm the dismissal of Moncier's Section 1983 action and the denial of his request for preliminary injunctive relief. We decline to consider Moncier's remaining filings with this court, including an application for a temporary injunction on appeal and two motions to take judicial notice of news accounts and newly discovered events in Tennessee, because our dismissal renders them moot.