RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 21a0030p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

LIBERTARIAN PARTY OF OHIO and HAROLD THOMAS,

　　　　　　　　　　　　*Plaintiffs-Appellants*,


*v.*


DEGEE WILHEM, HELEN E. BALCOLM, OTTO BEATTY, III, DENNIS BROMMER, DON MICHAEL CRITES, CATHERINE A. CUNNINGHAM, and A. SCOTT NORMAN, in their official capacities,

　　　　　　　　　　　　*Defendants-Appellees*.

No. 20-3585

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:19-cv-02501—Algenon L. Marbley, District Judge.

Argued:  August 24, 2020

Decided and Filed:  February 10, 2021

Before:  GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.

─────────────────

## COUNSEL

**ARGUED:**  Mark R. Brown, Columbus, Ohio, for Appellants.  Michael J. Hendershot, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.  **ON BRIEF:**  Mark R. Brown, Columbus, Ohio, for Appellants.  Michael J. Hendershot, Benjamin M. Flowers, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

―――――――――――

**OPINION**

―――――――――――

GRIFFIN, Circuit Judge.

Ohio law mandates that the Ohio Elections Commission (OEC) be composed of three members from each of the top two political parties in the state, and an additional seventh member who cannot have any political affiliation. *See* Ohio Rev. Code § 3517.152(A)(1). The Libertarian Party of Ohio (LPO) and its former chairman, Harold Thomas, contend this law violates their First Amendment right to associate for political purposes. The district court disagreed, and we affirm.

I.

A.

Plaintiff Harold Thomas is the former chairman of the Libertarian Party of Ohio and a current member of the LPO.[1] During the 2020 election season, the LPO was a minor political party recognized in Ohio, but it lost its status by not receiving a sufficient share of the vote in the 2020 general election. Defendants are the appointed members of the Ohio Elections Commission (OEC or the Commission) and have been sued in their official capacities.

"[T]he Commission is an independent agency consisting of seven members, six of whom are appointed by the governor on the recommendation of the combined state House and Senate caucuses of the major political parties. Three members are appointed from each of the two major political parties and the seventh is an unaffiliated elector appointed by the other six members." *Project Veritas v. Ohio Election Comm'n*, 418 F. Supp. 3d 232, 236–37 (S.D. Ohio 2019). All members of the OEC serve five-year terms. The OEC enforces Ohio's campaigning and election laws. It may investigate complaints, issue fines, and publish advisory opinions on matters of Ohio election law. *See id.* It is also empowered to refer criminal violations of Ohio's election law to county prosecutors. *See* Ohio Admin. Code § 3517-1-14-(B)(3) and (C).

―――――――――――

[1]Thomas resigned his executive position while this appeal was pending.

The procedure for selecting OEC Commissioners is set forth in Ohio Revised Code § 3517.152(A)(1):

> There is hereby created the Ohio elections commission consisting of seven members.
>
> . . . [T]he speaker of the house of representatives and the leader in the senate of the political party of which the speaker is a member shall jointly submit to the governor a list of five persons who are affiliated with that political party. . . . [T]he two legislative leaders in the two houses of the general assembly of the major political party of which the speaker is not a member shall jointly submit to the governor a list of five persons who are affiliated with the major political party of which the speaker is not a member.  Not later than fifteen days after receiving each list, the governor shall appoint three persons from each list to the commission.
>
> * * *
>
> Not later than thirty days after the governor appoints these six members, they shall, by a majority vote, appoint to the commission a seventh member, who shall not be affiliated with a political party.  If the six members fail to appoint the seventh member within this thirty-day period, the chief justice of the supreme court, not later than thirty days after the end of the period during which the six members were required to appoint a member, shall appoint the seventh member, who shall not be affiliated with a political party.

As defendants observe, § 3517.152(A)(1) does not restrict the partisan seats to any specific party. Instead,

> three members will be selected from *any* party that wins enough seats in the legislature to qualify as one of the State's two major parties.  Thus, the parties to this appeal do not dispute that, if "a minor party" builds "its base and become[s] one of the two major parties in the state," it would secure "an avenue for its members to serve on the Elections Commission."  Rightly so:  though the statute does not say so expressly, it is implicit in the statute's party-neutral design that a political party, upon losing its major-party status, loses to the *new* major party its ability to nominate members to fill seats for which the term has expired.

Record citations omitted.  Based on this procedure and Ohio's election results, there are presently three Republican commissioners, three Democrat commissioners, and one commissioner with no party affiliation.  *See* Ohio Elections Commission, Members/Staff, *available at* https://elc.ohio.gov/wps/portal/gov/elc/about-us/membership-staff (last visited Feb. 4, 2021).

B.

In the lead-up to Ohio's 2018 gubernatorial election, three organizations hosted televised debates between the nominees chosen by the Democratic Party and the Republican Party, to the exclusion of other candidates, including the ballot-qualified nominee of the LPO.  In September 2018, the LPO filed administrative complaints with the OEC, alleging that each of the organizations hosting those debates had violated Ohio's campaign-finance laws because the exclusive debates between major-party candidates were illegal, in-kind campaign contributions. *See* Ohio Rev. Code § 3599.03.  But in December 2018, the OEC found no violation and dismissed the administrative complaints.

The LPO and Thomas then sued the individual commissioners of the OEC in their official capacities, alleging violations of their First and Fourteenth Amendment rights.  As relevant here, plaintiffs alleged that § 3517.152(A)(1) violated their First Amendment associational rights because it rendered LPO members ineligible for service on the OEC.[2]  The district court entered summary judgment in defendants' favor, reasoning § 3517.152(A)(1) withstood constitutional scrutiny under either of two potential frameworks.  This timely appeal followed.

II.

We review the district court's summary judgment determination de novo. *Thomas M. Cooley Law Sch. v. Kurzon Strauss, LLP*, 759 F.3d 522, 526 (6th Cir. 2014).  Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).

III.

Initially, we must address defendants' assertion, first raised on appeal, that plaintiffs lack standing.  The "irreducible constitutional minimum" of standing consists of three elements. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  Plaintiffs must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the

---

[2]Plaintiffs also alleged selective enforcement of Ohio's campaign finance laws.  The district court dismissed those claims for lack of standing, and plaintiffs do not challenge that ruling on appeal.

defendant, and (3) that is likely to be redressed by a favorable judicial decision. *Id.* at 560–561. Absent these three elements, a plaintiff has failed to show a present "case or controversy" that we are authorized to adjudicate under Article III of the Constitution. *Id.* at 560 ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III."). Therefore, even though the failure to raise an issue before the district court usually renders it forfeited on appeal, *see, e.g.*, *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014), we must consider plaintiffs' standing because it implicates our subject-matter jurisdiction, *see Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016), and such defects cannot be forfeited, *see United States v. Cotton*, 535 U.S. 625, 630 (2002) ("[D]efects in subject-matter jurisdiction require correction regardless of whether the error was raised in district court.").

The OEC offers several reasons why plaintiffs have not demonstrated their standing to challenge § 3517.152(a). First, it says that Thomas, as LPO chairman, was not eligible for membership on the Commission at the time the lawsuit was filed under a separate provision of § 3517.152. Specifically, defendants point out that Ohio law prohibits political party officers from serving on the OEC. *See* Ohio Rev. Code § 3517.152(F)(1)(c) ("No member of the Ohio elections commission shall . . . [b]e an officer of the state central committee, a county central committee, or a district, city, township, or other committee of a political party or an officer of the executive committee of the state central committee, a county central committee, or a district, city, township, or other committee of a political party[.]"). While Thomas is no longer the chairman of the LPO, standing must exist from the outset of the suit, so if Thomas lacked Article III standing at the time the complaint was filed, his resignation of the chairmanship cannot cure the defect. *See Smith v. Jefferson Cty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 206 (6th Cir. 2011).

But Thomas had standing at the outset of the suit. As the OEC concedes, Thomas "has introduced evidence that he would like to be on the Ohio Elections Commission[,]" but his membership in the Libertarian Party prevents him from being considered for the seventh commission seat. Under these circumstances, "a plaintiff need not translate his or her desire for a job into a formal application" because "that application would be merely a futile gesture." *Carney v. Adams*, 141 S. Ct. 493, 503 (2020) (internal quotation marks, brackets, and citation

omitted).**³**  Further, the separate provision § 3517.152 poses no obstacle to Thomas's eligibility because it prohibits a person only from *simultaneously* holding public office as an OEC commissioner and a leadership position in a political party.   *See* § 3517.152(F)(1)(c). Accordingly, if Thomas had been selected for a seat on the OEC, he could have resigned his party leadership role (and has now done so while this appeal was pending).  Thus, the record demonstrates that Thomas has standing to challenge § 3517.152(A)(1), and further discussion of plaintiffs' standing is unnecessary to our resolution of the suit.  *See Mays v. LaRose*, 951 F.3d 775, 782 (6th Cir. 2020).

IV.

Moving now to the merits, we recognize that there are arguably two frameworks that plaintiffs may invoke to establish a violation of their First Amendment rights—*Anderson-Burdick* and the unconstitutional-conditions doctrine.  However, we limit our holding to the latter because the parties agree that we should forego application of *Anderson-Burdick* to plaintiffs' claim.**⁴**  *See* Appellant's Opening Br. at 48 ("LPO does not believe it necessary to apply the *Anderson-Burdick* formula here. . . ."); Reply at 28 ("LPO does not believe *Anderson-Burdick* needs [to] be used in this case."); Appellee's Br. at 49 ("[T]he Court should refuse to apply *Anderson-Burdick*.").

---

**³**In *Carney*, the Supreme Court concluded that a Democrat-turned-independent did not have standing to challenge Delaware's "major party" requirement, which mandated the state's judges be a member of either of the two most popular political parties.  *Carney*, 141 S. Ct. at 498–503.  The Court reached this conclusion by observing in part that the plaintiff had not applied to any of 14 judicial openings for which he would have been eligible as a Democrat between 2012 and 2016, and that his decision to switch his political affiliation from Democrat to unaffiliated independent "made it less likely that he would become a judge[,]" but more likely that he could "vindicate his view" that Delaware's major party requirement was unconstitutional.  *Id.* at 501.

**⁴**In a recent case, we declined to decide which of these frameworks applied to First and Fourteenth Amendment challenges brought against the criteria for government service on Michigan's Independent Citizens Redistricting Commission.  *Daunt v. Benson*, 956 F.3d 396, 406 (6th Cir. 2020).  While some may harbor doubts over the applicability of *Anderson-Burdick* to such cases because the challenged law neither regulates the administration of elections nor burdens voting rights, *see id.* at 422–24, 429–31 (Readler, J. concurring), we leave that matter for another day when it is properly before the court.

A.

The unconstitutional-conditions doctrine prevents the government from denying a benefit on the basis of a person's constitutionally protected speech or associations. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). In *Perry*, the Court explained that the government

> may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech. For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited. This would allow the government to produce a result which it could not command directly. Such interference with constitutional rights is impermissible.

*Perry*, 408 U.S. at 597 (alteration and internal citation omitted). In a trio of cases, the Supreme Court has employed the unconstitutional conditions doctrine to examine the tension between governmental patronage practices—hiring and firing based on political affiliation—and the First Amendment rights of individuals. Those cases warrant further discussion.

First, in *Elrod v. Burns*, Justice Brennan wrote for a plurality of the Court and held that patronage dismissals violated the First and Fourteenth Amendments because they amounted to the government conditioning employment on particular political affiliations, and thus "severely restrict[ed]" the employees' right to "political belief and association." 427 U.S. 347, 372 (1976). However, the plurality also acknowledged that First Amendment protections were "not . . . absolute[,]" and that patronage dismissals did not violate the First Amendment in "policymaking positions." *Id.* at 360–61, 367–68. Concurring in the judgment, Justices Stewart and Blackmun would have decided the case on narrower grounds: "[A] nonpolicymaking, nonconfidential government employee" could not be discharged solely because of his political beliefs under *Perry*. *Id.* at 375 (Stewart, J., concurring in the judgment).

The Court then built upon *Elrod* in *Branti v. Finkel*, 445 U.S. 507 (1980). There, the issue was whether the dismissal of two assistant public defenders for their political affiliation violated the First Amendment, or whether the plaintiffs fit within *Elrod*'s policymaking exception. *Id.* at 510–11. The Court clarified that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring

authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Id.* at 518. "As one obvious example," the Court explained, "if a State's election laws require that precincts be supervised by two election judges of different parties, a Republican judge could be legitimately discharged solely for changing his party registration." *Id.* With this understanding, the Court held that the patronage dismissals of the plaintiffs violated the First Amendment because "[t]he primary, if not the only, responsibility of an assistant public defender is to represent individual citizens in controversy with the State." *Id.* at 519.

Finally, in *Rutan v. Republican Party of Illinois*, the Court considered "whether promotion, transfer, recall, and hiring decisions involving low-level public employees may be constitutionally based on party affiliation and support." 497 U.S. 62, 65 (1990). The case arose out of a system of patronage instituted by the Governor of Illinois by imposing a state-wide hiring freeze and then requiring that any exception to the freeze receive his "express permission." *Id.* When determining whether permission should be granted, the governor's office looked at whether the applicant voted in his party's primaries, provided financial or other support to his party, had joined or promised to work for the party in the future, and whether the applicant was supported by local party officials. *Id.* at 66. Moreover, state officials also allegedly used party affiliation to make decisions about recalling laid-off employees and when selecting employees for promotions. *Id.* at 67. The Supreme Court held "that the rule of *Elrod* and *Branti* extends to promotion, transfer, recall, and hiring decisions based on party affiliation." *Id.* at 79.

B.

As discussed above, the touchstone of our inquiry is "whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. However, we do not write on a blank slate; our precedent fills in many of the gaps for determining whether or not party affiliation is an appropriate criterion for government employment. Most significantly, we elaborated in *McCloud v. Testa* on the types of positions for which it would not violate the First Amendment to consider party affiliation and set forth four categories of public employment that fall "with reasonable certainty" within the *Elrod-Branti* exception:

**Category One**: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;

**Category Two**: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

**Category Three**: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;

**Category Four**: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

97 F.3d 1536, 1557 (6th Cir. 1996) (footnotes omitted). Further, the *McCloud* court instructed that where there is "any ambiguity" in determining whether a particular position falls within one of the categories, "it is to be construed in favor of the governmental defendants" at least when the position is "unclassified or non-merit under state law." *Id.* It also provided examples of positions in each category. Relevant here, we explained that "a gubernatorially-appointed Democratic economist placed on a revenue forecasting committee consisting by law of two economists (one Republican and one Democrat) chosen by the state legislature, two economists of similar party affiliation chosen by the governor, and one economist of any party chosen by the president of the state's most prominent university" would fall within Category Four. *Id.*

More recently, in *Peterson v. Dean*, we considered whether Tennessee's county election administrators were subject to patronage dismissals under the *Elrod-Branti* exception. 777 F.3d 334, 336 (6th Cir. 2015). Tennessee law requires the State Election Commission to appoint five election commissioners for each county, with three members being of the majority party and two members of the minority party. *Id.* at 338. The county commissioners, in turn, were required to "appoint an administrator of elections" to serve as the "chief administrative officer of the commission." *Id.* Eight of these county administrators were ousted from their positions allegedly because of their actual or perceived political affiliation. They then filed suit under

42 U.S.C. § 1983, claiming that their patronage dismissals violated their First and Fourteenth Amendment rights. *Id.* at 340. On appeal, the parties agreed that "the common and controlling issue was whether the statutory position of county administrator of elections in Tennessee [was] lawfully subject to patronage dismissal" under *Elrod* and *Branti*. *Id.* at 337.

In concluding the administrators fell within the exception, we started from the premise that county election commissioners in Tennessee were Category One employees under *McCloud* because their positions were statutorily established and vested with discretionary authority to carry out functions of political concern. *See id.* at 345. From there, we observed that "[c]ategory two is constructed to recognize that it may be necessary to deny First Amendment protection not just to positions at the very top of any state administrative hierarchy, but in some cases to those occupying levels a bit farther down the hierarchy." *Id.* at 345 (quoting *McCloud*, 97 F.3d at 1557 n.31). Thus election administrators "neatly fit[]" into Category Two because "the position [was] one to which a significant amount of the total discretionary authority available to category-one employees ha[d] been delegated." *Id.* at 346 (quoting *Summe v. Kenton Cty. Clerk's Office*, 604 F.3d 257, 266 (6th Cir. 2010)).

Writing in dissent, Judge Clay disagreed. In his view, the county election commissioners were not Category One employees because they did not "exercise meaningful discretion on issues where there is room for principled disagreement on the goals or their implementations." 777 F.3d at 352 (Clay, J., dissenting) (internal quotation marks omitted). Judge Clay instead concluded that they were subject to patronage dismissals because their positions fell within Category Four, given that they were "filled by balancing out political party representation." *Id.* (quoting *McCloud*, 97 F.3d at 1557). Accordingly, while he concluded that county administrators could not be discharged for their political affiliation, all three members of the panel agreed that the county election commissioners were subject to patronage dismissals. *Id.*

## C.

Applying the foregoing precedent to the plaintiffs' claim, the district court properly granted summary judgment in favor of defendants because OEC Commissioners fall within Category Four of the *McCloud* framework, and Ohio may thus condition employment on the

OEC on party affiliation.  They are akin to the supervisory judges discussed in *Branti*, 445 U.S at 518, the economists appointed to maintain partisan balance in *McCloud*, 97 F.3d at 1557, and the county election commissioners in *Peterson*, 777 F.3d at 346; *id.* at 352 (Clay, J., dissenting). Accordingly, § 3517.152(A)(1) is not an unconstitutional condition on government employment because it is "appropriate" for Ohio to consider political affiliation to serve its stated interest in maintaining partisan balance among the members of the OEC.  For this reason, § 3517.152(A)(1) does not violate plaintiffs' First Amendment rights.

Plaintiffs' arguments to the contrary are not persuasive.  First, they compare § 3517.152(A)(1) to laws prohibiting persons from government service based on immutable characteristics or laws that require a person seeking public employment to profess a certain belief or disbelief in religion, or laws requiring a person to forswear membership in a "disfavored political organization" for government employment.  The challenged law is similar, in their view, because it "condition[s] one's full participation in Ohio's political community and electoral machinery on forfeiting her freedom of association."  Therefore, the argument goes, "[b]anning members of minor parties from office is no more constitutional than banning Jews or Republicans from office."

We disagree.  Section 3517.152(A)(1) does not single out any ideology, viewpoint, or protected class.  It instead operates such that whichever parties are the two most represented factions in the Ohio legislature—for now the Republicans and the Democrats, but subject to change should another party achieve greater electoral success—receive three seats each on the OEC with one additional seat to a person with no political affiliation.  There is no comparison to be drawn from laws which afford equality of opportunity to all political parties, and those that expressly prohibit a person from government employment because of a protected characteristic. *Cf. American Party of Texas v. White*, 415 U.S. 767, 781 (1974) (holding that it is not invidious discrimination for a state to grant minor parties official recognition, but deny them the right to hold primaries even though the main political parties are so entitled); *Jenness v. Fortson*, 403 U.S. 431, 440 (1971) (holding that Georgia did not violate the First or Fourteenth Amendment rights of independent candidates or unrecognized political parties by requiring that they petition for access to the ballot, while recognized parties—who attained twenty percent of

the vote in a prior election—obtained ballot access by holding a primary election); *see also Werme v. Merrill*, 84 F.3d 479, 484–85 (1st Cir. 1996) ("[T]he Libertarian Party has exactly the same opportunity to qualify as a source of election inspectors and ballot clerks under New Hampshire law as does any other party. Equality of opportunity exists, and equality of opportunity—not equality of outcomes—is the linchpin of what the Constitution requires in this type of situation.").

Second, the LPO attempts to draw a distinction between "discretionary hiring and firing decisions" and "statutory categorical disqualifications" because *Elrod* and the cases that follow govern only the former and do not bear on the latter. This distinction is not borne out by our caselaw. Look no further than *McCloud* or *Peterson*. In each of those cases, our court clearly contemplated statutory schemes that would result in "categorical" exclusions to maintain partisan balance. The touchstone under *Elrod* and *Branti* is whether the State of Ohio can demonstrate that party affiliation is an "appropriate" requirement for the effective performance of the public office involved. *See Branti*, 445 U.S. at 518. That remains the standard whether Ohio is justifying hiring criteria as in *Rutan* or the discharge of an existing employee like *Branti*. We thus reject plaintiffs' attempt to recast decades of precedent.[5]

V.

For these reasons, we affirm the judgment of the district court.

---

[5]Plaintiffs also contend that we should follow the Third Circuit's reasoning from *Adams* and conclude that commissioners are not policymakers. Defendants respond that *Adams* is contrary to our precedent, citing *Newman v. Voinovich*, 986 F.2d 159 (6th Cir. 1993). We need not address this purported conflict because the Supreme Court vacated our sister court's opinion and remanded with instructions to dismiss the case for lack of jurisdiction. *Carney*, 141 S. Ct. at 503.