RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0016p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

LISA PETERSON; MARY LYNN BUSH; DIANE CASHON; GLENDA C. MCNUTT; DANA ZEHNER; BRENDA KAY DODSON; PATRICIA LUMPKINS; TYCIA L. KESTERSON,

   *Plaintiffs-Appellants,*

 *v.*

JAMES DEAN, et al.,

   *Defendants-Appellees.*

No. 14-5219

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 3:09-cv-00628—Kevin H. Sharp, Chief District Judge.

Argued: October 2, 2014

Decided and Filed: January 28, 2015

Before: SILER, CLAY, and GRIFFIN, Circuit Judges.

───────────────

### COUNSEL

**ARGUED:** W. Gary Blackburn, THE BLACKBURN FIRM, PLLC, Nashville, Tennessee, for Appellants. John I. Harris III, SHULMAN, LEROY & BENNETT, P.C., Nashville, Tennessee, for DeKalb County Appellees. **ON BRIEF:** W. Gary Blackburn, THE BLACKBURN FIRM, PLLC, Nashville, Tennessee, for Appellants. John I. Harris III, SHULMAN, LEROY & BENNETT, P.C., Nashville, Tennessee, for DeKalb County Appellees. Jeffrey M. Ward, Thomas J. Garland, Jr., MILLIGAN & COLEMAN PLLP, Greeneville, Tennessee, for Hawkins County Appellees. John D. Schwalb, JOHN D. SCHWALB, PLLC, Franklin, Tennessee, for Cannon County Appellees. Robert O. Binkley, Jr., Geoffrey A. Lindley, RAINEY, KIZER, REVIERE & BELL, P.L.C., Jackson, Tennessee, for Weakley County Appellees.

 GRIFFIN, J., delivered the opinion of the court in which SILER, J., joined. CLAY, J. (pp. 20–26), delivered a separate dissenting opinion.

1

———————————

**OPINION**

———————————

GRIFFIN, Circuit Judge.  In this action brought pursuant to 42 U.S.C. § 1983, plaintiffs, former county administrators of elections from eight counties in Tennessee, allege that following the 2008 statewide elections and a shift in the controlling political party in the state assembly, they were ousted from their positions by the defendants, county election commissioners, because of their actual or perceived political party affiliation, in violation of their First and Fourteenth Amendment rights of freedom of speech and equal protection.  Plaintiffs sued defendants in their individual and official capacities, seeking monetary damages and declaratory and injunctive relief.

In a series of rulings, the district court winnowed plaintiffs' claims down to one:  a Section 1983 claim for declaratory or injunctive relief against defendants in their official capacities as election commissioners.  The parties and the district court agreed that the common and controlling issue was whether the statutory position of county administrator of elections in Tennessee is lawfully subject to patronage dismissal under *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980).  The district court answered this question in the affirmative, examining the inherent duties of county election administrator in the context of the categorical criteria of *McCloud v. Testa*, 97 F.3d 1536 (6th Cir. 1996).  The court therefore granted defendants' motions to dismiss and/or for summary judgment and entered a final judgment in favor of all defendants.  Plaintiffs now appeal.  For the reasons that follow, we affirm.

I.

The eight plaintiffs in this case all served as county election administrators for their respective counties in Tennessee.  The district court accurately described the statutory hierarchy of state and county election officials created by the Tennessee legislature, of which the county election administrators are a part:

> The State Election Commission is a statutory creation.  Codified at Tenn. Code
> Ann. § 2-11-101, the State Election Commission presently consists of seven

members, four of whom are to be members of the majority party, three of whom are to be members of the minority party, and all of whom "shall first be nominated by a joint senate-house caucus of the members of the party of which such person is a member." Tenn. Code Ann. §§ 2-11-103 (a) & (b).[1]

The State Election Commission is required to appoint five election commissioners for each county in Tennessee, three of whom "shall be members of the majority party" and two of whom "shall be members of the minority party." Tenn. Code Ann. § 2-12-103(a). The five so appointed comprise the county election commission and these commissioners hold office for two years. Tenn. Code Ann. § 2-12-101.

Each county election commission, in turn, is required to "appoint an administrator of elections, who shall be the chief administrative officer of the commission and shall be responsible for the daily operations of the commission office and the execution of all elections." Tenn. Code Ann. § 2-12-116(a)(1). The appointed administrator is required to have a high school diploma or GED, and "[i]n evaluating a prospective appointee, the commission shall consider the knowledge and experience of such prospective appointee in the following areas: administrative, managerial, instructional, communication, budgetarial, purchasing, promotional, legal and general office skills and other related skills necessary to fulfill the statutory requirements of administrator." *Id.*

The job duties of the administrator are also prescribed by statute. Specifically, Tenn. Code Ann. § 2-12-201[a] provides that his or her "duties include, but are not limited to, the following":

(1) Employment of all office personnel . . .
(2) Preparation of the annual operating budget and presentation of such budget to the election commission for approval;
(3) Upon approval by the county election commission, presentation of the annual budget to the county commission or other legislative body for funding;
(4) Requisition and purchase of any supplies necessary for the operation of the election commission office and the conduct of all elections;
(5) Maintenance of voter registration files, campaign disclosure records, and any other records required by this title;
(6) Conducting of instruction class for poll workers or designation of another qualified person to conduct such class;
(7) Preparation of all notices for publication required by this title;
(8) Preparation and maintenance of all fiscal records necessary for the daily operation of the election commission office and all elections. This may include any requests for funding or changes in funding, if necessary, after adoption of the current fiscal budget;

---

[1]At the time the instant action was commenced in July 2009, the Tennessee State Election Commission had five members, three of whom were from the majority party, and two of whom were from the minority party. The number of members was increased to seven, effective April 26, 2011. *See* 2011 Tenn. Pub. Acts, c. 125, §§ 1-2.

(9) Compilation, maintenance and dissemination of information to the public, the candidates, the voters, the press and all inquiring parties in regard to all aspects of the electoral process on all governmental levels;

(10) Promotion of the electoral process through supplemental registrations, public functions, press releases and media advertising whenever possible;

(11) Attendance at any required seminar and other educational seminars, as funding permits, to gain knowledge beneficial to the administration of the election commission office or to the electoral process;

(12) Having knowledge of all current laws pertaining to the election process and any changes mandated by the general assembly, and apprising the election commission, office staff, candidates, the press and the public in general of this information;

(13) *Assistance in the planning and implementation of any plan of apportionment or reapportionment of any governmental entity involved in the electoral process*;

(14) The county election commissioners may not employ themselves or any of their spouses, parents, siblings, in-laws or children as administrator;

(15) *Preparation of a plan for placing precinct voting locations and presentation of such plan to the election commission for approval*;

(16) *Preparation of a plan for early voting sites and presentation of such plan to the election commission for approval*; and

(17) Upon request, assist the:

    (A) City councils, as appropriate, for cities located in the county;

    (B) County legislative body;

    (C) Local board of education; and

    (D) Members of the general assembly representing the county, concerning redistricting in 2012, and thereafter every two-year period following each decennial census taken by the United States census bureau.

(Emphasis added.)

As these statutes reflect, in Tennessee the state legislature has established a system wherein the majority party has control of the state and county election commissions. Membership on these commissions is based explicitly on political party affiliation. The county commissions in turn appoint a county election administrator to assist in running the elections.

In the 2008 election, the majority and minority parties of the Tennessee General Assembly flipped, with the Republican Party taking control of each house. This change of party control in the state government ushered in changes in the offices of Secretary of State, the state election coordinator, the state election commission, and all of the local election commissions serving in each county. Following the 2008 election, defendants—county election commissioners who represented the majority Republican Party—terminated plaintiffs'

employment as election administrators, allegedly appointing in their stead members or supporters of the Republican Party.

In July 2009, eight former county election administrators filed this lawsuit against defendants, asserting that the political partisanship mandated by statute for the state and county election commissions could not be applied constitutionally to any decisions to retain, reappoint, or appoint the administrators. Plaintiffs alleged, in pertinent part, that they were county employees and that "[a]dministrators of elections are ministerial officers who make no policy, enjoy limited discretionary authority, exercise no ultimate budgetary authority, and are expected to perform all duties of the office with political impartiality." Plaintiffs stated that in December 2008, after the election, "the House Republican Caucus Whip and member of the Tennessee Republican Party State Executive Committee, published a memo to elected Republican members of the Tennessee legislature setting forth a requirement that an individual be a 'bona fide Republican' for appointment to positions such as election commissions." Plaintiffs further alleged that prior to each defendant's appointment as a county election commissioner, "[d]efendants met with members and officials of the state and county Republican Party and certain elected Republican members of the state legislature and committed, as a condition of their appointment, to terminate [p]laintiffs' employment and appoint a member or supporter of the Republican Party to replace [p]laintiffs." Plaintiffs averred that "prior to public meetings of each county election commission, [d]efendants in each county met in private and communicated, deliberated, and agreed to vote to terminate [p]laintiffs' employment," and contended that they were terminated solely because of their actual or perceived political party affiliation and replaced with a member or supporter of the Republican Party. According to plaintiffs, but for their political affiliation, they would still be employed as administrators of elections, as they received no criticism regarding their job performance.

The original complaint asserted, inter alia, violations of plaintiffs' rights to freedom of speech and equal protection under the First and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983. Plaintiffs sought monetary damages and declaratory and injunctive relief against defendants in their official and individual capacities.

The case progressed and, as the result of the issuance of several orders granting in part defendants' motions to dismiss, the district court narrowed plaintiffs' action down to the § 1983 claim for declaratory and injunctive relief against all defendants in their official capacities. The court dismissed the claimed violations of state law and found that defendants, as state officials, were not liable for monetary damages in either their official or individual capacities. The district court also dismissed plaintiffs' claims for injunctive and declaratory relief against defendants in their individual capacities.

Subsequently, following discovery, defendants filed additional motions for summary judgment and/or motions to dismiss. Acknowledging that a common question in each of these motions was whether the position of administrator of elections is a patronage position, and that resolution of this issue could be outcome determinative as to many of the motions and serve as a basis for an interlocutory appeal, the district court held a status conference with the parties at their request and indicated that in an effort to streamline matters, it would issue an opinion on the patronage question. On February 21, 2013, the court issued its decision on this point, holding that plaintiffs' positions were subject to patronage dismissal, thereby foreclosing plaintiffs' § 1983 constitutional claims.

The parties jointly moved the district court to alter or amend its order for the purpose of permitting an interlocutory appeal. The district court granted the motion to certify its order for immediate appeal, but this court denied the ensuing interlocutory appeal by the parties. The parties, having agreed that the political patronage issue as previously determined by the district court was dispositive of the case, then filed a joint motion for entry of final judgment. Accordingly, on February 20, 2014, the district court entered a final order and judgment granting defendants' motions to dismiss or for summary judgment for the reasons set forth in its patronage-issue opinion, denying as moot the motions to the extent that they raised alternative grounds for dismissal, and dismissing the case with prejudice. Plaintiffs now timely appeal.

II.

A.

In order to prevail on their § 1983 claims, plaintiffs must prove that defendants deprived them of their rights guaranteed by the Constitution while acting under color of state law. *Lane v. City of LaFollette, Tenn.*, 490 F.3d 410, 418 (6th Cir. 2007). It is clear that defendants acted under the color of state law in terminating plaintiffs; thus, the key question is whether plaintiffs' discharge involved the deprivation of a First Amendment right.

We review the district court's grant of summary judgment de novo. *Seeger v. Cincinnati Bell Tel. Co., LLC*, 681 F.3d 274, 281 (6th Cir. 2012). "Whether political affiliation is an appropriate consideration for a government position is a question of law." *Sowards v. Loudon Cnty.*, 203 F.3d 426, 435 (6th Cir. 2000). "[I]f, as a matter of law, the inherent duties of [a government employee] are political in character, patronage considerations may justifiably influence or control the [employment action], and any claim initiated under 42 U.S.C. § 1983 by a former [employee] for alleged patronage discharge is nonviable as a matter of law." *Mumford v. Basinski*, 105 F.3d 264, 271–72 (6th Cir. 1997). "[T]he issue on summary judgment is whether [d]efendants have established that no genuine factual issue exists as to whether political affiliation may appropriately be considered with respect to the position in question." *Feeney v. Shipley*, 164 F.3d 311, 314 (6th Cir. 1999) (internal quotation marks omitted).

It is well established that patronage dismissals of public employees based upon political beliefs or affiliations are generally prohibited as violative of the employees' First Amendment freedoms of political belief and association. *Elrod*, 427 U.S. at 356–57.[2] However, in limited circumstances, these constitutional rights bow to the government's interest in maintaining efficiency and effectiveness, or the need for political loyalty, and party affiliation may be a legitimate requirement for government employment. *Id*. at 366–68. "Justice Brennan wrote that '[l]imiting patronage dismissals to policymaking positions is sufficient to achieve' the valid governmental objective of preventing holdover employees from undermining the ability of a new

---

[2]This principle extends not only to the termination of an employee for his political beliefs or affiliation, but also to the failure to reappoint an employee upon the expiration of a term of office, and to other employment actions such as transfers, promotions, demotions, recalls, or appointments. *Rutan v. Republican Party*, 497 U.S. 62, 72 (1990); *Branti*, 445 U.S. at 512 n.6; *Newman v. Voinovich*, 986 F.2d 159, 162 (6th Cir. 1993).

administration to implement its policies." *Hall v. Tollett*, 128 F.3d 418, 422 (6th Cir. 1997) (quoting *Elrod*, 427 U.S. at 367). By contrast, "[n]onpolicymaking individuals usually have only limited responsibility and are therefore not in a position to thwart the goals of the in-party." *Elrod*, 427 U.S. at 367.

This dichotomy is not easy to discern. "While nonpolicymaking individuals usually have limited responsibility, that is not to say that one with a number of responsibilities is necessarily in a policymaking position." *Id*. at 367. Moreover, "[i]t is equally clear that party affiliation is not necessarily relevant to every policymaking or confidential position." *Branti*, 445 U.S. at 518. "In determining whether an employee occupies a policymaking position, consideration would also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals." *Elrod*, 427 U.S. at 368. In short, "[t]he nature of the responsibilities is critical" and requires a case-by-case analysis to determine whether the so-called *Elrod–Branti* exception applies. *Id*. at 367; *see also Sowards*, 203 F.3d at 439 n.4 ("Because the duties of a jailer may vary from state to state, it is important to examine the applicable state and local law when deciding whether political considerations may be used in employment decisions concerning a jailer.").

"[T]he ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position; rather, the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. This test requires the courts to look beyond the mere job title and examine the inherent duties of the position at issue and the duties that the new position-holder will perform. *Lane*, 490 F.3d at 419; *Baker v. Hadley*, 167 F.3d 1014, 1018 (6th Cir. 1999).

Our court has identified four categories of positions that fall with reasonable certainty under the so-called "*Elrod–Branti* exception" to the prohibition on patronage dismissal:

> Category One: positions specifically named in relevant federal, state, county, or municipal law to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted;
>
> Category Two: positions to which a significant portion of the total discretionary authority available to category one position-holders has been delegated; or

positions not named in law, possessing by virtue of the jurisdiction's pattern or practice the same quantum or type of discretionary authority commonly held by category one positions in other jurisdictions;

Category Three: confidential advisors who spend a significant portion of their time on the job advising category one or category two position-holders on how to exercise their statutory or delegated policymaking authority, or other confidential employees who control the lines of communications to category one positions, category two positions or confidential advisors;

Category Four: positions that are part of a group of positions filled by balancing out political party representation, or that are filled by balancing out selections made by different governmental agents or bodies.

If a particular position falls into one of these categories, then political affiliation is an appropriate consideration for that position and a public employee may be dismissed without violating the First Amendment. A government position is not required, however, to fall neatly within one of the categories to be entitled to the *Elrod–Branti* exception.

*Sowards*, 203 F.3d at 435–36 (quoting *McCloud*, 97 F.3d at 1557) (internal citation omitted).[3]

The *Elrod–Branti* exception "is to be construed broadly, so as presumptively to encompass positions placed by the legislature outside of the 'merit' civil service." *McCloud*, 97 F.3d at 1542. Consequently, "if there is any ambiguity about whether a particular position falls into any of [the four categories] (and so also within the *Branti* exception), it is to be construed in favor of the governmental defendants when the position at issue is unclassified or non-merit under state law. . . ." *Id.* at 1557.

"'Government officials may . . . terminate at-will relationships . . . without cause; but it does not follow that this discretion can be exercised to impose conditions on expressing, or not expressing, specific political views.'" *Lane*, 490 F.3d at 419 (quoting *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 725–26 (1996)); *see also Perry v. Sindermann*, 408 U.S. 593, 597 (1972) ("[T]his Court has made clear that even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number

---

[3]In numerous cases preceding the *McCloud* framework, our court held that certain positions were subject to patronage dismissal. *See, e.g.*, *Blair v. Meade*, 76 F.3d 97 (6th Cir. 1996) (chief financial officer and office manager for elected county judge executive); *Rice v. Ohio Dep't of Transp.*, 14 F.3d 1133 (6th Cir. 1994) (district administrative assistant for state department of transportation); *Faughender v. City of North Olmsted*, 927 F.2d 909 (6th Cir. 1991) (mayor's secretary); *Monks v. Marlinga*, 923 F.2d 423 (6th Cir. 1991) (assistant prosecuting attorney); *Williams v. City of River Rouge*, 909 F.2d 151 (6th Cir. 1990) (city attorney); and *Balogh v. Charron*, 855 F.2d 356 (6th Cir. 1988) (court bailiff).

of reasons, . . . [i]t may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."). Thus, "[i]f [a] [p]laintiff can demonstrate that he was terminated on account of his political beliefs, then the fact that he was an at-will employee who could have been terminated for other permissible reasons is irrelevant to the ultimate question of [d]efendants' liability." *Lane*, 490 F.3d at 419–20.[4]

B.

The first step in assessing a patronage dismissal claim requires asking whether the plaintiff has produced sufficient evidence for a jury to find that he was discharged because of his political beliefs or affiliations. *Lane*, 490 F.3d at 419. If the plaintiff succeeds in making this prima facie showing, then the burden shifts to the defendant to demonstrate that the position falls within an exception to the rule against patronage dismissals. *Id*. Here, in granting summary judgment, the district court assumed arguendo that plaintiffs made out a prima facie case and that the actual duties performed or expected to be performed by plaintiffs were in keeping with those listed in the relevant Tennessee statutes.

The parties agreed that the position of county election commissioner held by defendants falls within category one of the *McCloud* equation. Defendants argued to the district court that plaintiffs' administrator position likewise fit within category one, or alternatively, categories two and/or three. Conversely, plaintiffs argued that none of the categories applied. The district court determined that plaintiffs' positions fell within categories two and three and, therefore, plaintiffs were subject to patronage dismissal.

---

[4]Although Tenn. Code Ann. § 2-12-116 and § 2-12-201 clearly grant the county election commission authority to appoint the county election administrator, the statutes neither establish a set term nor provide for automatic reappointment and are silent as to a dismissal procedure. In these circumstances, Tennessee common law provides that "[t]he right of removal from office is an incident to the right of appointment unless the term of the official is fixed by law for a definite period." *Gamblin v. Town of Bruceton*, 803 S.W.2d 690, 693 (Tenn. Ct. App. 1990); *see also Dingman v. Harvell*, 814 S.W.2d 362, 365 (Tenn. Ct. App. 1991) ("[T]he office of Chief of Police has no prescribed term and therefore at best the term of office is limited to that of the Board of Alderman which is the appointing authority."). Thus, election administrators are at-will employees whose terms are tied to those of the county election commission. *See* Tenn. Op. Att'y Gen. No. 98-216, 1998 WL 851359, at *1 (Tenn. A.G. Nov. 23, 1998) (opining that "the county election commission may remove the administrator of election as it sees fit unless there is a contract between the commission and the administrator that governs termination of the administrator."). This characteristic also removes the position from the "merit" system and gives rise to a presumption that it is subject to patronage dismissals. *McCloud*, 97 F.3d at 1542.

In this appeal, the parties reiterate their respective stances, but our review of the record leads us to affirm the district court's holding. As a preliminary matter, we note that some defendants argue that the plaintiffs/administrators from their counties were terminated for reasons other than political affiliation or voluntarily resigned. However, a genuine factual dispute exists as to whether plaintiffs' terminations were politically motivated and violated their constitutional rights. Viewing the facts in the light most favorable to plaintiffs on defendants' motions for summary judgment, plaintiffs have produced sufficient evidence to establish a prima facie case of patronage dismissal or—alleging in detail that they were informed that they would be terminated imminently because of their political affiliation and replaced with an individual who was a member or supporter of the Republican Party—constructive discharge.

Defendants are nonetheless entitled to summary judgment because, as the district court held, they have clearly met their burden of showing that the position of election administrator falls under the *Elrod–Branti* exception to patronage dismissals, thereby precluding plaintiffs' § 1983 claims.

We begin with defendants' argument, rejected by the district court, that the position of election administrator possesses the characteristics of a category-one position. As explained in *McCloud*:

> Category one captures the intuition gained from reading *Elrod*, *Branti*, and *Rutan* that a chief executive's cabinet secretaries and similar employees fall into the *Branti* exception. The proviso that the policymaking authority possessed by a category one position-holder must be held in relation to a matter of political concern stems from the discussion in *Branti* that a football coach is a policymaker, but not the sort of policymaker for whom political affiliation is an appropriate requirement under the First Amendment. *See Branti*, 445 U.S. at 518[.]

*McCloud*, 97 F.3d at 1557 n.30.

The *McCloud* court gave as an illustrative example of category one "a secretary of state given statutory authority over various state corporation law policies." *Id*. at 1557. Under the category one analysis, the focus is "on whether positions established in law are political in nature." *Justice v. Pike Cnty. Bd. Of Educ.*, 348 F.3d 554, 560 (6th Cir. 2003). *See, e.g., Ray v. Davis*, 528 F. App'x 453, 459 (6th Cir. 2013) (holding that the position of county trustee was a

category-one position because it was a "statutorily-created, elected position, vested with discretionary authority to carry out functions of political concern, including the collection, accounting, and distribution of state and county taxes."); *Hoard v. Sizemore*, 198 F.3d 205, 214 (6th Cir. 1999) (holding that the position of county road foreman was inherently political and fell squarely within the category one); *Collins v. Voinovich*, 150 F.3d 575, 578 (6th Cir. 1998) (holding that the executive director of the Ohio Lottery Commission fell within category one because it was a cabinet-level position named in state law and "charged with administering the [lottery] in accordance with the governor's mandate"); *Mumford*, 105 F.3d at 272–73 ("The inherent duties of an Ohio domestic relations court referee . . . satisfy the strictures of categories one, two, and three, as Ohio law expressly assigns some discretionary adjudicative authority to the referees, permits Ohio judges to delegate other adjudicative powers to the referees, and provides that the referees shall proffer advice (often in confidence) to the judges concerning the disposition of cases and other legal controversies.").

In *Summe v. Kenton Cnty. Clerk's Office*, 604 F.3d 257 (6th Cir. 2010), we held that the elected position of county clerk, established by the Kentucky Constitution, was a category-one position, because it was an elected position with a four-year term and pursuant to state statute: "County Clerks are charged with enforcing the law regarding the issuance of licenses, the registration of voters and the running of elections, and the storage and maintenance of legal and governmental records. County Clerks presumably have discretionary authority regarding how to facilitate these numerous and varied duties." *Summe*, 604 F.3d at 267. Relative to this position, we deemed the chief deputy county clerk to be a category two post, because the deputy served at the behest of the county clerk, the duties were defined entirely by the clerk, and the role was one of confidential advisor who controlled lines of communication to the clerk and implemented a cross-training program which entailed political concerns. *Id.* at 267–68.

Here, in an effort to convince the district court that plaintiffs are category-one employees, defendants relied upon *Summe*, arguing that the position of election administrator is comparable to the chief county clerk in *Summe*. But the district court rejected this notion, stating,

> If anything, *Summe* supports the proposition that members of the county election commission are, like the County Court Clerk, category-one employees, while the administrator of elections is more akin to the position of Chief Deputy. . . .

Obviously, the members of the county election commission are not expected to personally shoulder all of the job duties they are tasked with performing. Quite the contrary, the county commission is required to hire an administrator who, as indicated, is "responsible for the daily operations of the commission office and the execution of all elections." [Tenn. Code Ann. 2-12-116(a)(1)]. Moreover, and also by statute, many of the responsibilities of the county commission are effectively delegated to the administrator. For example, while the county election commission is required to approve an annual budget, approve voting equipment, and hire necessary legal counsel, it is to do so "upon the recommendation of the administrator." *Id*. §§ (a)(2)-(a)(4).

These specifics, as well as the overall interplay between the commission and the administrator who runs the daily operations of the office, suggest "that the position is one to which a significant amount of the total discretionary authority available to category-one employees has been delegated." *Summe*, 604 F.3d at 266. Just like the category-two Chief Deputy in *Summe*, county election administrators, to a large extent, run the show for their appointing body, the county election commission.

The court's analogy is well taken. "Category two is constructed to recognize that it may be necessary to deny First Amendment protection not just to positions at the very top of any state administrative hierarchy, but in some cases to those occupying levels a bit farther down the hierarchy." *McCloud*, 97 F.3d at 1557 n.31. An illustrative example of a category-two employee would be "a deputy secretary of labor in a state, to whom the secretary of labor has delegated the responsibility for crafting the department's annual proposed legislative agenda." *Id*. at 1557. "What distinguishes category two positions from others is the exercise of discretion of *political significance*." *Justice*, 348 F.3d at 561. "[T]he hallmark of a [category] two position is not high rank, but *political* discretion, even if exercised at a fairly low level." *Id.*

"Other significant [indicators] are whether the administrative assistant functioned as a communicator on subjects not purely technical in nature, whether he had meaningful input into government decisionmaking on issues where there is room for principled disagreement on the goals or their implementations, and, more precisely, whether he had meaningful input into decisions on where and when, within his [district,] work was to be done." *Rice*, 14 F.3d at 1142 n.9 (citations and internal quotation marks omitted); *see also Elrod*, 427 U.S. at 368 ("In determining whether an employee occupies a policymaking position, consideration should also be given to whether the employee acts as an adviser or formulates plans for the implementation of broad goals.").

Accordingly, in *Dixon v. Univ. of Toledo*, 702 F.3d 269, 276 (6th Cir. 2012), we held that an associate vice-president of human resources for a state university, who was responsible for recommending, implementing, and overseeing policy, and supervising other employees, was a category-two employee. And in *Ray*, 528 F. App'x at 459–60, we deemed the position of business manager for a county trustee to be a category-two position, noting that the county trustee was a category-one employee to whom the business manager was responsible for facilitating the collection, accounting, and distribution of state and county taxes, preparing the personnel manual, supervising all employees in the office, presenting financial reports to the county commission, controlling the office bank account, and making budgetary decisions. *See also Garvey v. Montgomery*, 128 F. App'x 453, 466 (6th Cir. 2005) (administrative officer, who possessed broad authority to manage the central operations of the county recorder's office, was a category-two position); *Hoard*, 198 F.3d at 215–16 (assistant county road foreman, garage supervisor/purchasing agent, and senior citizens director were category-two positions).

The position of Tennessee administrator of elections neatly fits within the types of positions contemplated by our court as category-two positions, for the reasons articulated by the district court. Since the commissioners do not hold full-time positions, the statutes expressly provide that the administrator of elections is the "chief administrative officer of the commission" who is "responsible for the daily operations of the commission office and the execution of all elections." Tenn. Code Ann. §§ 2-12-116(a)(1), 2-12-201(a). By statute, numerous responsibilities of the commission are expressly delegated to the administrator. For instance, "upon the recommendation of the administrator," the commission is required to approve an annual budget, approve the purchase of voting equipment, and hire legal counsel if necessary to conduct the business of the commission. Tenn. Code Ann. § 2-12-116(a)(2)-(4). Thus, "the position is one to which a significant amount of the total discretionary authority available to category-one employees has been delegated." *Summe*, 604 F.3d at 266.

The comprehensive list of statutory duties of the administrator make it clear that the administrator must think independently, analyze information, formulate policies and procedures, advise the commission, and exercise considerable political discretion. Significantly, the administrator makes recommendations to the election commission regarding the implementation

of any plans for redistricting, precinct boundaries, polling stations, and early voting locations. Tenn. Code Ann. § 2-12-201(a)(13), (a)(15), and (a)(16).  These duties bear obvious political implications.  *See Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("Politics and political considerations are inseparable from districting and apportionment. . . .  The reality is that districting inevitably has and is intended to have substantial political consequences."); *see also Shaw v. Reno*, 509 U.S. 630, 661 (1993) ("Redistricting plans also reflect group interests and inevitably are conceived with partisan aims in mind.").

The administrator also maintains and oversees all fiscal matters, prepares the budget for the commissioners for their approval, and then presents the budget on behalf of the election commission to the county commission for funding.  Tenn. Code Ann. §§ 2-12-201(a)(2), (a)(3), and (a)(8).  Because "[m]oney consistently plays a very important role in politics . . . budgetary decisions are among the most significant, and the most political, actions which government officials take."  *Blair*, 76 F.3d at 100.  "The efficient and orderly administration of a budget is an integral part of the budgetary process and certainly has key political implications and consequences."  *Id*.  The position of administrator is therefore of a nature that permits appointment determinations to take political affiliation into consideration under this court's precedents.

No doubt, administrators execute numerous clerical, administrative, and purely ministerial responsibilities.  The administrator must requisition supplies, maintain voter registration files, conduct classes for poll workers, prepare election notices, compile and disseminate information to the public, and attend seminars.  *See* Tenn. Code Ann. § 2-12-201(a).  Plaintiffs cite several Tennessee Supreme Court opinions[5] for the proposition that the office of election administrator is purely ministerial in nature, with only limited discretionary powers, and, therefore, not subject to patronage dismissal.  However, as defendants argue and the district court found, these decisions discussing the ministerial aspects of the commission and administrator positions involved entirely inapposite contexts, with little or no bearing on the issues relevant to an *Elrod–Branti* exception analysis.  Moreover, the fact that some duties of the administrator

---

[5]*See City of Memphis v. Shelby Cnty. Election Comm'n*, 146 S.W.3d 531 (Tenn. 2004); *Shelby Cnty. Election Comm'n v. Turner*, 755 S.W.2d 774 (Tenn. 1988); *Peeler v. Beasley*, 231 S.W.2d 321 (Tenn. 1950); *Curtis v. State*, 43 S.W.2d 391 (1931); *Taylor v. Carr*, 141 S.W. 745 (Tenn. 1911).

may be classified as "ministerial" does not preclude the determination that other designated duties, such as budgeting, reapportionment, and acting as an adviser to the commission are policymaking and inherently political tasks.

Plaintiffs also assert that the position of administrator should be apolitical, arguing that "affiliation with a dominant political party [is not] a necessary requirement for the effective performance of the task of holding free and impartial elections." Appellant's Brief at p.10. However, "the test is not whether party affiliation and support are *essential* to the effective performance of the public office involved; the test, under *Branti*, is whether these are 'appropriate' requirements." *Rice*, 14 F.3d at 1142. In this vein, one court has aptly pointed out that the requirement of nonpartisanship for a comparable position of county elections manager is not determinative of the *Elrod–Branti* question: "[I]t would be inappropriate for an Elections Manager to use his or her position to skew elections or influence voters on political questions. But the issue here is not how much political change the officeholder may validly effectuate, but rather whether there is a need for the officeholder to be committed to the goals and objectives of the reigning faction." *Soelter v. King Cnty.*, 931 F. Supp. 741, 747 (W.D. Wash. 1996), *aff'd* 132 F.3d 40 (9th Cir. 1997) (citing our decision in *Newman*, 986 F.2d at 162–63 (holding that the fact that judges must be nonpartisan decisionmakers does not mean political affiliation cannot be considered in making judicial appointments)).

In *Soelter*, a former county manager of records and elections in the state of Washington brought a wrongful discharge action under § 1983 against the county defendants, alleging that her discharge for political reasons violated the First and Fourteenth Amendments. The plaintiff claimed that she was dismissed by the newly-elected county executive, a Democrat, because she was a member of the Republican Party. *Soelter*, 931 F. Supp. at 742. The district court granted the defendants' motion for summary judgment, applying the *Elrod–Branti* exception to conclude that the manager's statutory duties and non-merit status "ma[de it] clear that political affiliation, or more specifically commonality of political purpose and support, is an appropriate requirement for the position." *Id*. at 745. The court explained:

> The Elections Manager possesses a substantial degree of responsibility and discretion in running the Division of Records and Elections. The officeholder makes significant decisions concerning how elections are conducted, where

polling places are located, how and in what form information is disseminated to voters and the public at large, and in certain cases whether precincts are combined, united, or divided for purposes of a particular election. In addition, the Elections Manager communicates with and works with the governing bodies of cities, towns, and districts in establishing the manner in which county or local elections are conducted, and in formulating administrative rules governing dissemination of voter information. The Elections Manager also performs certain quasi-judicial functions, in that he or she conducts hearings and issues binding rulings on challenges to voter registration. Given the scope of the duties inherent in the position, it is clear that the Elections Manager has meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.

\* \* \*

Defendants have identified several issues within the province of the Elections Manager where there is room for principled disagreement between the political parties, such as whether aggressive efforts should be made to increase voter registration, whether voter registration should be simplified, and whether voting, by mail or otherwise, should be made easier. There is also substantial room for disagreement on issues of budgeting and the setting of fiscal priorities for the division. Thus, while the Elections Manager must act in a nonpartisan manner, he or she nevertheless plays an important role in the implementation and effectuation of the County Executive's policies. Because the position of Elections Manager authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation, political affiliation may constitutionally serve as a requirement for the position.

*Id.* at 745–47 (citation and internal quotation marks omitted); *see also Millus v. D'Angelo*, 224 F.3d 137, 138 (2d Cir. 2000) (per curiam) (holding that the plaintiffs' position as elections day operations coordinator, employed by the city board of elections, was one of political patronage and thus was not entitled to First Amendment protection).

This rationale is applicable to the present analogous position and reinforces the district court's conclusion in the present case that political affiliation is a permissible consideration in selecting an elections administrator under Tennessee law. As noted, the election commission, as the appointing entity, is selected entirely based on political factors. Control of the election commission was designed by the Tennessee legislature to change periodically in order to give the "majority" party complete practical control of the state and county election commissions. As defendants argue, prohibiting the majority party from taking party affiliation into account when

selecting its chief administrator, especially following a flip in majority status as happened here, could cause substantial friction and administrative upset between commissioners and the administrator. The entire operation of the election commission is a matter of political concern where the party in power is granted, by statute, control over the management of local elections in a manner that the majority political party believes best comports with the requirements of the law. Consequently, all of the identified duties of the administrator that involve policy matters are matters of political concern. Under these circumstances, as the district court concluded, it is appropriate to allow the county election commissions that are politically appointed to take into consideration political party affiliation for the purpose of selecting their chief administrative officer. Therefore, we hold that the district court did not err in determining that the inherent responsibilities of an election administrator constituted a policymaking position that falls within category two of the *McCloud* analysis.

## C.

As the district court found, plaintiffs' position also fits with reasonable certainty within the contours of a category-three position. "Category three is formulated to comport with the discussion in *Branti* indicating that a state governor may 'believe that the official duties of various assistants who help him write speeches, explain his views to the press, or communicate with the legislature cannot be performed effectively unless those persons share his political beliefs and party commitments.'" *McCloud*, 97 F.3d at 1557 n.32 (quoting *Branti*, 445 U.S. at 518). "This category also includes those who control the lines of communication to category one or category two position-holders," *id.*, and "is concerned with this type of employee's access to confidential, political information transmitted to the policymaker, which requires political loyalty." *Sowards*, 203 F.3d at 437.

> [W]here . . . the employee exercises significant authority on behalf of a policymaker (even with close supervision), where the employee is responsible for making important policy implementation recommendations to a policymaker, and where the inherent duties of the employee are broad and limited primarily by the discretion of the policymaker, it is likely that the employee is herself a confidential or policymaking employee under *Elrod*.

*Latham v. Office of Att'y Gen. of State of Ohio*, 395 F.3d 261, 268–69 (6th Cir. 2005).

The duties of the administrator of elections meet these criteria. The administrator spends a significant portion of time advising the commissioners, category-one employees, on how to exercise their statutory policymaking authority, including apprising the commissioners of current laws and changes in the law, assisting in reapportionment matters, preparing the annual budget, and overseeing election operations. Obviously, the administrator, as the chief administrative officer for the commission, also controls the lines of communications to category-one employees, the commissioners. Thus, consistent with our case law, we have no hesitation in concluding that category three also applies to the administrator. *See Ray*, 528 F. App'x at 460–61 (the position of business manager for the county trustee occupied a confidential advisor role and therefore was a category-three position); *Summe*, 604 F.3d at 268–69 (affirming categorization of deputy county clerk as not just a category two but also a category-three position); *Latham*, 395 F.3d at 268–69 (assistant state attorney general was a category-three position because, although closely supervised, she was responsible for making policy recommendations to the state attorney general); *Collins*, 150 F.3d at 578 (Ohio Lottery Commission legal-counsel position falls within category three because it entails "communicat[ing] departmental views to the press or the legislature"); *Hall*, 128 F.3d at 426 n.4 (chief deputy sheriff, who at times acted as "confidential advisor to the sheriff," was a category-three employee).

Because the position of Tennessee administrator of elections is a position for which political affiliation is a permissible requirement for the effective performance of that public office, the district court properly granted summary judgment in favor of defendants on the ground that plaintiffs were lawfully subject to patronage dismissal.[6]

III.

For the foregoing reasons, we affirm the judgment of the district court.

---

[6]In light of our holding, we need not address plaintiffs' next argument that the district court erred in determining in a separate ruling that defendants were entitled to qualified immunity for claims brought against them in their individual capacities. A qualified immunity defense is "implicitly addressed by the *Elrod–Branti* analysis." *Ray*, 528 F. App'x at 461 n.8. "Determining whether qualified immunity exists generally involves first determining whether a constitutional violation occurred and, if so, a subsequent determination of whether the right infringed was clearly established. Therefore, in order to overcome qualified immunity, [plaintiffs] would have to establish that a 'clearly established' constitutional right was violated[,]" and "[b]ecause [plaintiffs'] dismissal falls into the *Elrod–Branti* exception, no constitutional violation occurred." *Id.* (citation omitted).

_____

**DISSENT**

_____

CLAY, Circuit Judge, dissenting.  I respectfully dissent.  Tennessee law concerning the position of county election administrator, in my view, compels a conclusion that the position is not one for which political loyalty is an appropriate requirement.  First, county election administrators serve multi-member commissions that, by statutory design, include members of both the majority and the minority political parties.  Second, contrary to the majority, I conclude that the duties assigned to the county administrators by statute do not involve significant policymaking discretion, and that the position is not otherwise suited to classification as category two under the *McCloud* framework.  *McCloud v. Testa*, 97 F.3d 1536, 1557 (6th Cir. 1996).  Third, because the administrator is not in a confidential relationship with the county election commission, nor would such a relationship be appropriate in light of Tennessee's open meeting laws, I do not agree with the majority's alternative holding that Plaintiffs were subject to patronage dismissal as category three employees under the *McCloud* framework.

**I.**

The majority takes as its point of departure the apparent agreement of the parties that the position of county election commissioner falls within category one of the *McCloud* scheme.  Maj. Op. at 10.  This classification appears to be inescapably flawed, and the majority errs by uncritically relying on the parties' stipulation on this point of law.  *Neuens v. City of Columbus*, 303 F.3d 667, 670 (6th Cir. 2002) ("'Parties may not stipulate to the legal conclusions to be reached by the court.'") (quoting *TI Fed. Credit Union v. DelBonis*, 72 F.3d 921, 928 (1st Cir. 1995)).

Under *McCloud*, category one comprises positions named by law "to which discretionary authority with respect to the enforcement of that law or the carrying out of some other policy of political concern is granted."  97 F.3d at 1557.  Under Tennessee law, county election commissioners do not enjoy discretion or policymaking authority sufficiently robust to meet this test.  For a century, the Tennessee Supreme Court has repeatedly held that the authority of

county election commissions is ministerial, rather than discretionary, in nature.**1**    *City of Memphis v. Shelby Cnty. Election Comm'n*, 146 S.W.3d 531, 535 (Tenn. 2004) ("as ministerial officers, the [County Election] Commission and the [State Election] Coordinator have limited discretion."); *Shelby Cnty. Election Comm'n v. Turner*, 755 S.W.2d 774, 776 (Tenn.1988) ("[T]he Election Commission has only ministerial duties."); *Peeler v. State ex rel. Beasley*, 231 S.W.2d 321, 323 (1950) (holding that the duties of county election commissions are ministerial); *Curtis v. State*, 43 S.W.2d 391 (1931); *Taylor v. Carr*, 141 S.W. 745, 750 (1911) ("The duties of the commissioners of election are only ministerial"); *see State ex rel. Tidwell v. Morrison*, 274 S.W. 551, 552 (1924).

Nor does an examination of their statutory duties support a conclusion that Tennessee county election commissions enjoy a significant degree of "discretionary authority with respect to . . . [some] policy of political concern." *McCloud*, 97 F.3d at 1557 (defining category one). These duties are in large part detailed and mandatory, comprising tasks such as certifying and canvassing voting machines, certifying election results, sealing absentee ballot boxes, and keeping minutes of all commission meetings.  Tenn. Code Ann. § 2-12-116 (6), (8), (11), (12). Even in the performance of duties that arguably entail some degree of discretion, such as purchasing voting machines or hiring an election administrator, the commission must adhere to detailed standards spelled out in statute or regulation. *See, e.g.*, Tenn. Code. Ann. §§ 2-9-101, 2-9-110, 2-9-117 (setting detailed specifications for voting machines; requiring non-standard machines to conform with the rules of state election coordinator; requiring approval of the state coordinator of elections and state election commission prior to purchase as well as periodic review by these authorities to ensure that the machines "meet the minimum criteria for certification"); Tenn. Code Ann. § 2-11-16(1) (requiring the commission to consider a candidate's competencies in nine subject areas in appointing an administrator).  In short, it does not appear that the commissions exercise meaningful discretion "on issues where there is room for principled disagreement on the goals or their implementations." *See Rice v. Ohio Dept. of*

---

**1**Although it is true these decisions were not reached with any reference to the *Elrod-Branti* exception to First Amendment protection against patronage dismissal, the state high court's consistent description of commissioners as ministerial officers is impossible to reconcile with the degree of discretionary authority envisioned in *McCloud* category one.  The majority distinguishes this clear precedent from the Tennessee Supreme Court as involving "entirely inapposite contexts, with little or no bearing on the issues relevant to an *Elrod-Branti* exception analysis."  Maj. Op. at 15.  I do not perceive how the context of these decisions could be "inapposite" to an analysis that considers the "inherent duties" of a given position. *Heggen v. Lee*, 284 F.3d 675, 681 (6th Cir. 2002).

*Transp.*, 14 F.3d 1133, 1142 n.9 (6th Cir. 1994) (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981)).

If the discretionary authority of the commission is narrow, the discretion enjoyed by any single county election commissioner with regard to these duties is necessarily even more limited, with the added hurdle of obtaining the concurrence of at least two other commissioners to act as a majority. Indeed, *McCloud*'s category one is a poor fit for a multi-member public body, particularly one that, by statute, is composed of appointees representing both the majority and the minority parties. Tenn. Code Ann. § 2-12-103(a). If the majority opinion is to be believed, the commissioners representing the minority in fact have no discretionary authority at all, because "complete practical control" has been granted to commissioners from the majority party. Maj. Op. at 17.

Instead, commissioners are more appropriately classified as category four officials under *McCloud*. That category covers "positions that are part of a group of positions filled by balancing out political party representation." *McCloud*, 97 F.3d at 1557. As this Court explained in *McCloud*, this fourth category was "formulated to accommodate the example given in *Branti* that an election judge could be dismissed without violating the First Amendment where state law requires that one election judge be a Democrat and the other a Republican"—a pertinent example for this case. *Id.* at 1557, n.33 (citing *Branti*, 445 U.S. at 518). Although the majority interprets Tennessee's statutory system as designed to give control to the majority party, the same statutory framework just as plainly requires representation of the minority party. Moreover, an intention to moderate majority control with some amount of balance between the parties is reflected in § 2-12-105, which requires each county election commission to select a chair and a secretary of opposing parties.

The proper categorization of county election commissioners is not a matter of idle interest. The majority relies substantially on the relationship between the administrator and the commission, emphasizing that numerous duties of the commission are delegated to the administrator and that the commission in many instances acts on the recommendation of the administrator. Maj. Op. at 14 (citing *Summe*, 604.F.3d at 266 ("the position is one to which a significant amount of the total discretionary authority available to category-one employees has

been delegated.")).  But the parties' agreement that commissioners are category one officials cannot create discretion on issues of political importance where the discretion does not otherwise exist.

I do, however, agree that the relationship between the administrator and the commissioners is important in determining whether the position falls within the *Elrod-Branti* exception to First Amendment protection against dismissal based on perceived political affiliation.  As the Supreme Court has explained, the "ultimate inquiry" in a patronage dismissal case is "whether the hiring authority can demonstrate that party affiliation is an *appropriate requirement* for the effective performance of the public office involved." *Branti*, 445 U.S. at 517-18 (emphasis added).  Only in these circumstances is the state interest compelling enough to justify infringing First Amendment rights. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 71 n.5 (1990). *See also McCloud*, 97 F.3d at 1543.  Here, the administrator serves a commission that, by explicit statutory design, includes commissioners affiliated with both the majority and the minority political parties.  This fact, it seems to me, argues powerfully for the conclusion that it would be inappropriate to select the administrator based on political affiliation with one of those parties.

## II.

Directly analyzing the statutory duties of the administrator leaves me still unable to agree with the majority that the position may be appropriately classified as category two under the *McCloud* framework.  The bulk of the administrator's duties are ministerial and administrative in nature, covering such matters as purchasing supplies, maintaining voter registration files and campaign disclosure records, providing for the instruction of poll workers, and maintaining fiscal records. § 2-12-201(a).

The majority heavily emphasizes the administrator's role in assisting with apportionment and redistricting processes, as well as the administrator's responsibility to set precinct locations, precinct boundaries, and early voting sites.  As to apportionment and redistricting, the administrator's role should not be overstated:  the relevant voting boundary lines are proposed and drawn by the General Assembly or by the legislative bodies of other pertinent units of government. *See* Tenn. Const., Art. II, § 4; Tenn. Code Ann. §§ 3-1-102, 3-1-103 (general

assembly shall set state senatorial and representative districts); Tenn. Const., Art. VII, § 1; Tenn. Code Ann. § 5-1-111 (county legislative bodies shall reapportion their districts every ten years). The political considerations of drawing electoral boundaries—considerations that are of course subject to constitutional limits—are primarily and significantly the responsibility of the political bodies drawing those boundaries. It bears remembering that some of the local governmental units turning to the administrator for assistance in the apportionment process may well be controlled by the party that is in the minority at the state level. It is therefore unsurprising that, as Plaintiffs attest in their affidavits, the role of county election administrators in this process is historically confined to supplying information regarding the number of eligible voters in relevant areas.

The administrators' responsibility in developing plans regarding precinct boundaries and the selection of polling places also falls short of vesting the position with material discretionary authority. The majority opinion does not articulate how these decisions concern issues allowing for principled disagreement on policy goals or implementation, but the brief of one set of Defendants is more forthcoming:

> [I]f an election commission, by majority vote, wishes to make it more difficult for a certain voting block perceived as being in favor of the minority party to conveniently vote, they need only move the polls to a different location in the precinct where it is less convenient, or reduce the number of early voting sites.

Dennis *et al.* Defs.' Br. at 25. Dirty tricks and voter suppression (whose constitutionality even where protected classes are not at issue must seriously be doubted, *see, e.g.*, *Davis v. Bandemer*, 478 U.S. 109 (1986)) are emphatically *not* the kind of appropriate policy goals that can justify infringing on an individual's First Amendment rights under the *Elrod-Branti* exception. The question, after all, is whether "party affiliation is an appropriate requirement for the effective performance *of the public office* involved." *Branti*, 445 U.S. at 518 (emphasis added); *see also id.* at 517 n.12 (noting that the *Elrod* plurality "emphasized that patronage dismissals could be justified only if they advanced a governmental, rather than a partisan, interest.").

Nor do county election administrators' budgetary responsibilities meaningfully support a category two designation. Plaintiffs' affidavits regarding their responsibilities explain that they had "no discretionary authority" in performing this duty. (*See, e.g.*, R. 250, Zehner Affidavit.)

As they explain, "A county election budget is simply a prediction of expense for the next fiscal year based upon experience from prior elections," derived from objective inputs like the number of polling places. (*Id.*) The county election commission then must approve the budget, of course subject to any amendment desired by a majority of the election commissioners, then submit it to the county governing body for approval. Administrators' role in this process is not particularly significant, nor, in contrast to the plaintiff in *Blair v. Meade*, 76 F.3d 97, 100-101 (6th Cir. 1996), do they directly advise those ultimately responsible for making the political decisions regarding how to balance the funding needs of different functions of county government.

The majority's remaining arguments are unconvincing. Application of the presumption that a non-civil service position is subject to patronage dismissal cannot overcome the fact that administrators simply do not meet the requirements of *McCloud* category two. Nor is the reasoning of *Soelter v. King County*, 931 F. Supp. 741 (W.D. Wash. 1996) persuasive. The elections manager at issue in that case appeared to enjoy significantly more policymaking responsibility, for example, in determining the "manner in which county or local elections are conducted," determining "in some cases, whether special elections will be conducted" at all, and lobbying and drafting official legislation as a representative of the county executive. 931 F. Supp. at 745-46. *McConnell v. Adams*, 829 F.2d 1319 (4th Cir. 1987) is a much better guide for the present case. There, the Fourth Circuit held that a position comparable to a county election administrator was protected from patronage dismissal where the statute required "certain political party affiliation for members of electoral boards," but not for the registrars, and it did not appear that "political party affiliation would either enhance or detract from a registrar's job performance." *Id.* at 1324. The court explained that "[w]hile the Virginia statutory scheme may facilitate political patronage in the appointment of registrars, this alone does not satisfy the *Branti* standard. Party affiliation must be more than a matter of convenience; it must be an appropriate requirement for the position." *Id.*

In sum, the duties of the administrators do not entail the type of discretionary authority that under *McCloud*'s category two renders political affiliation with the reigning party on the commission an appropriate qualification for office.

**III.**

Finally, county election administrators cannot reasonably be considered category three officials under the *McCloud* framework. Category three "is concerned with [an] employee's access to confidential, political information transmitted to the policymaker, which requires political loyalty." *Sowards v. Loudon Cnty., Tenn.*, 203 F.3d 426, 437 (2000). The primary flaw in applying category three to county election administrators is that there is no evidence from the description of their statutory duties or otherwise that they are in a *confidential relationship*—a necessary element of the category—with the county election commissions. *McCloud*, 97 F.3d at 1557 (describing category three employees as "*confidential* advisors . . . or other *confidential* employees who control the lines of communications to category one positions, category two positions or confidential advisors.") (emphasis added). To the contrary, meetings of the commission are governed by Tennessee's open meetings law. Tenn. Code. Ann. § 8-44-101 *et seq.*

An official serving a multi-member commission composed of representatives from opposing political parties cannot be presumed to occupy a position of confidential trust in a manner analogous to category one officials and their chief deputies or staff advisors. In some cases, other facts may establish confidentiality, such as the lawyer-client relationship between a city attorney and the city council. No such extenuating circumstances are applicable here. Therefore, I cannot agree with the majority that Plaintiffs were subject to patronage dismissal as category three employees.

**CONCLUSION**

Because county election administrators enjoy neither the discretionary authority on issues of political importance nor the confidential relationship with their commissions that would render them exempt from First Amendment protections, I would reverse the district court's grant of summary judgment. Additionally, because the *McCloud* categories were clearly established as the framework guiding application of the *Elrod-Branti* exception in this circuit, and because the reasoning above regarding their duties is an uncomplicated application of *McCloud*, I would also reverse the grant of qualified immunity.